**VANWYK TEXTILE SYSTEMS, B.V., et al., Plaintiffs,**

v.

**ZIMMER MACHINERY AMERICA, INCORPORATED, et al., Defendants.**

**No. 3:95CV483–MCK.**

United States District Court, W.D. North Carolina, Charlotte Division.

Dec. 4, 1997.

352

Irving M. Brenner, Smith, Helms, Mulliss & Moore, LLP, Charlotte, NC, for VanWyk Textile Systems, B.V.,and VanWyk America Corp., Plaintiffs and Counter–Defendants.

Mark Merritt, A. Ward McKeithen, Robinson, Bradshaw & Hinson, P.A., Charlotte, NC, for Zimmer Machinery America, Inc., et al., Defendant amd Counter–Claimant.

## MEMORANDUM, OPINION AND ORDER

MCKNIGHT, United States Magistrate Judge.

This matter comes before the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c) to consider Defendant Zimmer Machinery Corporation's (Zimmer's)

motions for entry of judgment as a matter of law and, alternatively, for a new trial [docs. 82–1, 82–1], and for attorneys' fees [doc. 85], and Plaintiff Vanwyk Textile Systems' (Vanwyk's) motion for entry of judgment [doc. 93]. Having carefully considered the record, briefs, and cases cited,[1] the undersigned enters the following memorandum, opinion and order.

## MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALTERNATIVE MOTION FOR A NEW TRIAL

Pursuant to Rules 50(b) and 59, Fed.R.Civ. Pro., Zimmer renews its motion for judgment as a matter of law made at the close of all the evidence and, alternatively, moves for a new trial, or remittitur. For the reasons which follow, both motions will be denied.

### I. Standards

#### A. Motion for judgment as a matter of law

■ A motion for judgment as a matter of law will be granted:

[I]f "there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing] party." Fed. R.Civ.P. 50(a)(1). In making this determination the judge is not to weigh the evidence or appraise the credibility of witnesses, but must view the evidence in the light most favorable to the non-moving party and draw legitimate inferences in its favor.

*Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.) (alteration in original)(discussing the standard for j.n.o.v.),[2] *cert. denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). The court will grant the motion for judgment as a matter of law if "viewing the evidence most favorable to the party opposing the motion, a reasonable trier of fact could draw only one conclusion." *Walker v. Pettit Constr. Co.,* 605 F.2d 128, 130 (4th Cir.1979); *Winant v. Bostic,* 5 F.3d 767, 774 (4th Cir.1993)(Court may only grant

---

1. The undersigned thanks and commends counsel for both parties for their excellent briefs.

2. The terminology has changed from "j.n.o.v." and "directed verdict" to "judgment as a matter of law," effective December 1, 1991. Fed. R.Civ.P. 50.

judgment as a matter of law if, viewing the evidence in the light most favorable to the nonmovant and drawing every legitimate inference in the nonmovant's favor, the court "determine[s] that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party.").

### B. Alternate motion for new trial

■ Under Rule 50(b) a motion for a new trial under Rule 59 may be joined with a renewed motion for judgment as a matter of law. The movant may seek a new trial on any ground that would support a new trial motion under Rule 59, and the alternate motion for new trial is assessed according to the same standards that would apply if the motion were made independently under Rule 59.

[The] Rule 59 standards are well established in the Fourth Circuit:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Systems and Serv. v. Crane Nat. Vendors,* 99 F.3d 587, 594 (4th Cir.1996).

"Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done ... " 11 *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,* Federal Practice and Procedure: Civil 2d § 2803 (1995). "If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." *Id.* "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." *Rule 61, Fed.R.Civ.Pro.*

■ "The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages, but it may do so if the proceedings have been tainted by appeals to prejudice or if the verdict, in the light of the evidence, is so unreasonable that it would be unconscionable to permit it to stand." 11 *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,* Federal Practice and Procedure § 2807.

### C. Remittitur

■ In *Atlas Food Systems,* the Fourth Circuit discussed remittitur:

> [A] remittitur, used in connection with Federal Rule of Civil Procedure 59(a), is the established method by which a trial judge can review a jury award for excessiveness. Remittitur is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.... And the permissibility of remittiturs is now settled.... Indeed, if a court finds that a jury award is excessive, it is the court's duty to require a remittitur or order a new trial.

*Id.* at 593.

> Except in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not arbitrarily reduce the amount of damages, for to do so would deprive the parties of their constitutional right to a jury.

11 *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,* Federal Practice and Procedure, § 2815.

■ "Remittitur is said to be proper 'where no clear judicial error or pernicious influence can be identified, but where the verdict is so large as to shock the conscience of the court.'" *Id., citing Abrams v. Lightolier,* 841 F.Supp. 584 (D.C.N.J.1994). "... the trial judge is not called upon to say whether the amount is higher than he personally would have awarded." *Dagnello v. Long Island Railroad Company,* 289 F.2d 797 (2d Cir.1961). However, "... reduction only to the highest amount that the jury could properly have awarded ... is the only theory that has any reasonable claim of being

consistent with the Seventh Amendment."
*Id.*

## II. Breach of fiduciary duty

Zimmer argues that the jury's verdict awarding Vanwyk $83,071 in damages for breach of fiduciary duty relating to Twin Rivers should be set aside on two grounds. First, Zimmer contends, any fiduciary duty Zimmer owed to Vanwyk terminated as of September 27, 1995, before anything in connection with the Twin Rivers transaction took place (i.e., there was no relationship from which any fiduciary duty could arise). Second, Zimmer contends that Vanwyk failed to prove that it would have made the sale had Zimmer not breached any fiduciary duty (i.e., no requisite causation).[3]

### A. Termination of fiduciary duty

█ Vanwyk's argument is that it lost the Twin Rivers sale because of Zimmer's bad faith in the timing and manner of termination of its fiduciary relationship with Zimmer. Although there was no fiduciary duty after September 27, 1995, the Twin Rivers sale was lost, according to Vanwyk, because of breaches of fiduciary duty occurring before September 27, 1995. Thus, assigning to Vanwyk's argument the premise that the fiduciary relationship extended past the date of termination, does not address Vanwyk's point. Vanwyk's premise is that the post-termination-date proximately-caused consequence of a pre-termination-date breach of fiduciary duty can be the basis of an award of damages for breach of fiduciary duty; a corollary of the uncontroversial principle that a plaintiff is entitled to be fairly compensated for all damages to his business proximately caused by a defendant's wrongful conduct, and thus may seek monetary recompense which would placed him or her in the same position as he would have occupied had the breach not occurred.

### B. Proximate cause

Guidance for assessment of the parties' respective arguments on the causation issue is provided by *Charleston Area Medical Center, Incorporated v. Blue Cross and Blue Shield Mutual of Ohio, Incorporated,* 6 F.3d 243 (4th Cir.1993):

3. Zimmer's argument that there was no fiduciary duty is discussed elsewhere. For purposes of

Although issues of causation are to be decided by the jury, whether the evidence is sufficient to create a jury issue is solely a question of law to be determined by the court.... [The federal] rule presents the question whether there is evidence on which a jury properly can base a verdict....

The question often has proved troublesome for the courts because judges are understandably loath to deny to earnest litigants their right to trial by jury. Fair and proper adjudication of disputes, however, precludes jury consideration of a party's claim unless the party produces evidence demonstrating that claim to be at least a reasonable probability rather than merely one of several equally surmisable possibilities....

This emphasis, where causation is dispositive, upon "probability," "reasonable probability," "substantial probability" rather than mere "possibility" as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere "possibilities," by impermissible but understandable resort to such factors as sympathy and the like. It is of course precisely to guard against this danger that the burden of producing rationally probative evidence—and the corresponding risk of nonproduction—is placed upon claimants and subjected to the ultimate control device[] of [judgment as a matter of law].

Notwithstanding this danger of jury speculation, we are constrained when reviewing a case in which the sufficiency of the evidence is at issue to view the evidence in the light most favorable to the party against whom the motion is made, giving that party the benefit of all reasonable inferences from the evidence. We may not weigh the evidence, pass on the credibility of the witnesses, or substitute our judgment of the facts for that of the jury.... That deference to the jury's findings is not,

this discussion, the existence of a fiduciary duty is presumed.

however, absolute: "A mere scintilla of evidence is insufficient to sustain the verdict, and the inferences a jury draws to establish causation must be reasonably probable."

*Id.,* 6 F.3d at 247–48.

■ Having carefully listened to and reviewed the evidence presented at trial, applying the above standard, crediting factual asseverations in the light most favorable to Vanwyk, giving Vanwyk the benefit of all reasonable inferences therefrom, not weighing the evidence, not passing on witness credibility, and not substituting the Court's judgment of the facts for that of the jury, and fully taking into account the denials of Contompasis and Weinheimer,[4] the undersigned is persuaded that the evidence having to do with Vanwyk's loss of the sale at Twin Rivers being proximately caused by Zimmer's breach of fiduciary duty prior to termination of its relationship with Vanwyk, was sufficient to create a jury issue and to provide a basis of reasonable inferential probability on which the jury could properly have based the verdict.

Specifically, Vanwyk put on evidence to the effect that Zimmer secretly began representing another manufacturer no later than August 3, 1995; that Zimmer's sales manager visited Termoelettronica in early September, 1995, by which time Zimmer was already making plans to sell Termoelettronica at ITMA; that Zimmer did not inform Vanwyk of Zimmer's decision to terminate its seven-year exclusive relationship with Vanwyk until September 27, 1995, just prior to ITMA; that Zimmer deliberately delayed informing Vanwyk that Zimmer was terminating its relationship with Vanwyk, freeing Zimmer to take advantage of the numerous sales opportunities on behalf of Termoelettronica at the critical October, 1995, ITMA show, when Vanwyk did not have time to adjust; that Twin Rivers agreed to buy Termoelettronica at ITMA; that Twin Rivers became aware of Termoelettronica solely as a result of its contacts with Zimmer; that Termoelettronica

was not a competitor in the U.S. market prior to Zimmer's representation; that the price for Stork was noncompetitive; that Vanwyk could competently manufacture a system which met Twin Rivers' specifications; that, working with Vanwyk, Zimmer had successfully sold an even larger system to Cherokee, a company whose "cut color" manufacturing process mirrored that of Twin Rivers; and that Vanwyk was hampered in its ITMA presentation, as to Twin Rivers, by Zimmer's last-minute ending of the relationship.

Moreover, although the credibility of Weinheimer and Contompasis (a voluntary Zimmer witness) was for the jury, Vanwyk presented evidence upon which the jury reasonably could have decided to accord their denials less or no weight. Twin Rivers now depends on Zimmer for service and has an ongoing relationship with Zimmer in keeping this substantial investment in operation. Second, Vanwyk drew out inconsistencies. Weinheimer testified that Twin Rivers did not give Zimmer an order for Termoelettronica equipment at ITMA, but Zimmer issued a confirmation order for the Termoelettronica system immediately after ITMA, and a letter from Zimmer's Doujak to Contompasis states that the commitment for the Termoelettronica dispensing system was received at ITMA. Having stated on direct that he fully reviewed the Vanwyk system, Contompasis admitted on cross that he was unaware that Vanwyk could manufacture a larger capacity system and that Vanwyk had expertise in designing color dispensing systems to accommodate "cut color" processes. Contompasis further admitted that neither he nor anyone from Twin Rivers had visited a Vanwyk installation or seen Vanwyk equipment in operation. He said he considered Vanwyk a "Johnny-come-lately" to the sales negotiations.

In sum, there was a legally sufficient evidentiary basis for a reasonable jury to have found for Vanwyk on the Twin Rivers causation issue. Nor, under the standards of Rule 59, is justice miscarried by this finding. For

---

**4.** In *Richmond Homes,* "[n]o other evidence [than Smith's articulated preference] establish[ed] the causation element required for recovery of damages...." *Richmond Homes Manage-* *ment, Inc. v. Raintree, Inc.,* 862 F.Supp. 1517, 1528 (W.D.Va.1994). Vanwyk presented other evidence to counter the testimony of Contompasis/Weinheimer.

the reasons set forth above, Zimmer's motion for judgment as a matter of law and, in the alternative, for a new trial, as to the verdict with respect to Twin Rivers will be denied.

## III. Punitive Damages Award

### A. The breach of fiduciary duty and fraud claims do not reduce to breach of contract.

Zimmer argues that Vanwyk has "manufacture[d] a tort dispute out of what is, at bottom, a simple breach of contract claim.... attempt[ed] to turn a contract dispute into a tort action with an accompanying punitive dimension ..." *Strum v. Exxon Company,* 15 F.3d 327, 329 (4th Cir.1994). According to Zimmer, since the jury found there was a contract, the Court should limit Vanwyk's recovery to breach of contract. Differing views of the facts and reciprocal blame casting should not take this action over into tort.

The amended complaint as to breach of contract reads in part:

11. Beginning in 1988, ZMC became the exclusive sales agent for Vanwyk in the United States and Canada. Upon information and belief ZMA assumed some or all of these duties in 1993. As Vanwyk's general agent, Zimmer agreed that it would sell only Vanwyk's dispensing equipment for textile printing and dyeing. Vanwyk in turn agreed not to sell its system through any other sales agent in those territories, except as agreed with Zimmer.

12. More specifically, *inter alia,*

a. Zimmer agreed to devote its best efforts to the solicitation of contracts for Vanwyk products; to inform Vanwyk of business possibilities and the activities of competitors in the United States and Canada; to obtain information about potential customers; and otherwise provide support for Vanwyk's efforts to sell and obtain payment for its products within Zimmer's sales territory;

b. Zimmer agreed to provide Vanwyk with reports of all discussions and business activities, lists of customers and prospective customers and other information with respect to the sales territory as Vanwyk

might reasonably need, and Zimmer agreed to send Vanwyk a copy of all correspondence between Zimmer and customers or potential customers;

c. Zimmer agreed to treat as confidential the commercial and business secrets which became known to it as a result of its activities for Vanwyk;

d. Vanwyk controlled the prices and terms on which Zimmer sold products as Vanwyk's agent;

e. Vanwyk and Zimmer agreed that their agency relationship could be terminated by either party only upon three months notice to the other party.

. . . .

41. By diverting orders and business opportunities intended for Vanwyk for its own benefit, failing to use its best efforts on Vanwyk's behalf, concealing from Vanwyk its activities in competition with Vanwyk, misappropriating Vanwyk's trade secrets and other confidential, proprietary information and terminating its relationship with Vanwyk without prior notice, Zimmer has violated the terms of its exclusive sales agency agreement with Vanwyk.

42. As a direct and proximate result of Zimmer's breach of its contract with Vanwyk, Vanwyk has suffered injury and loss to its business in an amount to be determined at trial, and Vanwyk is entitled to judgment against Zimmer for such injuries and loss.

*Amended Complaint.*

** 1. Fourth Circuit case law teaches that an independent tort claim, i.e., one factually bound to the breach of contract but legally distinct therefrom, one that applies to the circumstances of the case and which state law would recognize as an independent basis for the award of punitive damages, may be pursued along with breach of contract. If the breach establishes the elements of an independent, willful tort, it may support an award of punitive damages. However, an act, such as termination, which is contemplated in the contract will not support a tort claim if it is in accord with the terms of the contract and not contrary to equity**

and good conscience. **To state a claim in tort, a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract.**

This is consistent with the Restatement of Agency, which posits that "[i]f a paid agent does something wrongful, either knowing it to be wrong, or acting negligently, the principal may have either an action of tort or an action of contract. This is true when an agent..., by negligence or fraud, ... violates a duty of loyalty." *Id.* at § 401. "The principal has a cause of action either for breach of contract or for tort, as a remedy for damage caused by the violation of any duty of loyalty on the part of the agent." *Id.* at § 403.

■■■ *Strum* teaches that "[o]nly where a breach of contract also constitutes an 'independent tort' may tort actions be pursued." *Strum,* 15 F.3d at 330. While a fraud claim could constitute an independent tort if there is factual and legal support, "mere failure to carry out a promise in contract ... does not support a tort action for fraud." *Id.* at 331.

In *A & E Supply Company, Inc. v. Nationwide Mutual Fire Insurance Company,* 798 F.2d 669 (4th Cir.1986), the Court defined an "independent tort" under Virginia law as "one that is factually bound to the contractual breach but whose legal elements are distinct from it.... one that both applies to the circumstances of this case and that Virginia law would recognize as an independent basis for the award of punitive damages." *Id.* at 672. "Damages for breach of contract in Virginia normally are limited to the pecuniary loss sustained.... The general rule of contractual damages in Virginia admits but one exception. Only if the breach establishes the elements of an independent, wilful tort, may it support an award of punitive damages." *Id.* at 671–72 (internal quotation marks omitted).

In this case, A & E Supply, the insured, sustained financial loss for which its policy with Nationwide promised indemnification. Nationwide denied coverage, contending without factual support that the insured was responsible for the loss. The jury awarded A & E Supply the proceeds due and also punitive damages, which it had sought on the

theory that the insurer's breach amounted to several independent, willful torts. The Fourth Circuit held that A & E Supply did not prove the alleged fraud or conversion and that Virginia law would not recognize either the tort of bad faith refusal to honor a first-party insurance obligation or an implied private right of action under the state's unfair insurance practices statute. *Id.* at 670.

A & E Supply argued that the evidence supported fraud. *Id.* at 672. The Fourth Circuit concluded that the necessary evidence of fraud was absent. However, discussing Virginia law, it referred to fraud as "[a] familiar independent, wilful tort[]." *Id.* "But such tentative statements to Larry Fletcher, made soon after the fire had ended and the investigation had begun, were more perfunctory reassurances than promises of payment....A & E could not reasonably have relied on a belief that Nationwide had at this early point made any decision on the claim." *Id.*

In *Glaesner v. Beck/Arnley Corporation,* 790 F.2d 384 (4th Cir.1986), a suit for wrongful termination of a distributorship agreement in violation of South Carolina tort law and the South Carolina Unfair Trade Practices Act, the Court reversed and directed entry of judgment in favor of Beck/Arnley. "A termination is not wrongful if it is in accord with the terms of the contract and not contrary to equity and good conscience. Plaintiff has also failed to allege wrongful behavior on the part of Beck/Arnley in anything but speculative terms." *Id.* at 386. This dispute, the Court found, amounted to mutual recrimination. But the contract anticipated termination for business reasons and provided both parties the right to terminate. Glaesner only exercised its contractual option. The plaintiff alleged no breach of contract, but that termination was a tortious act. This the Court refused to find in the absence of extraordinary circumstances. *Id.* at 387–88. *Accord, Richland Wholesale Liquors v. Glenmore Distilleries Company,* 818 F.2d 312, 315–16 (4th Cir.1987)("[T]he focus is on whether there was malicious or arbitrary conduct in bringing about the termination. Glenmore's lack of malice in effecting the termination here is obvious. Not

only did it give Richland written notice that it was considering the termination six months before making its final decision, but before giving the notice it met with Richland a number of times to discuss its concerns about the sales situation. After giving notice, Glenmore continued to fill Richland's orders and Richland continued to sell Glenmore's products...." By contrast, Vanwyk's evidence showed that Zimmer terminated arbitrarily and so as to disrupt critical sales, having secretly agreed to promote a competitor, a very different situation indeed.)

In *Duc v. Orkin Exterminating Company, Inc.*, 729 F.Supp. 1533 (D.S.C.1990), Duc contended that Orkin had a contractual duty to inspect his house annually and to report to him any evidence of water damage discovered during the inspections. Duc claimed that Orkin did not make annual inspections as required by the contract or, if it did, it failed to notice or report to Duc any evidence of water damage. Had Orkin timely reported to Duc the existence of a plumbing leak, Duc claimed, he could have prevented or reduced the water damage that later occurred. *Id.* at 1535. The Court held that Duc could not recover on his negligence cause of action because Orkin owed Duc no legal duties independent of the contract, and in so reasoning stated:

> South Carolina courts have recognized the distinction between contract and tort causes of action and have held that in order for a plaintiff to state a claim in tort, he must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract:
>
>> Ordinarily, where there is no duty except such as the contract creates, the plaintiff's remedy is for breach of contract, but when the breach of duty alleged arises out of a liability independently of the personal obligation undertaken by the contract, it is a tort .... As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.
>
> ... Here, the duties and liabilities of the parties were created and defined by the

contract and the guarantee. Duc has alleged no breach of duty by Orkin that is independent of the contract and guarantee. *Id.* at 1535.

Duc's fraud claim alleged that Orkin fraudulently represented that it was complying with the terms of the contract but that it never intended to comply with the contract and yet took Duc's annual fee. *Id.* at 1536. The Court upheld summary judgment as to this contention in one sentence: "In South Carolina, a mere violation of a contract does not support a fraud claim." *Id.*

**2. Vanwyk's breach of fiduciary duty claim does not reduce to breach of contract.**

▄▄▄ As to breach of fiduciary duty, the amended complaint reads, in relevant part:

> 73. As Vanwyk's agent, Zimmer owed Vanwyk a fiduciary duty to act in good faith in Vanwyk's best interest.
>
> 74. By failing to act in Vanwyk's best interest, and instead using its agency relationship for its own benefit to the detriment of Vanwyk, Zimmer breached its fiduciary duty to Vanwyk.
>
> 75. Zimmer's breach of fiduciary duty to Vanwyk was intentional and willful.
>
> 76. As a direct and proximate result of Zimmer's unlawful conduct as alleged above, Vanwyk has been injured and damaged in an amount to be determined at trial, for which injury and damage Vanwyk is entitled to judgment against Zimmer.

*Amended Complaint.*

Zimmer argues that the breach of fiduciary duty claim is an attempt to recover in tort where the recovery should be limited to contract. Zimmer finds no authority for the proposition that the relationship between a manufacturer and its sales representative can be fiduciary. Further, the duties Vanwyk claims as fiduciary were also contractual, i.e., diversion of Vanwyk's business opportunities for its own benefit, failure to disclose to Vanwyk that Zimmer was assembling, manufacturing, and selling products directly in competition with Vanwyk, and failure to use its best efforts to promote Vanwyk's interests throughout the relationship.

Zimmer argued to the jury that Vanwyk's claims at most amount to "some breach of duty." Zimmer now contends that Vanwyk's claim reduces to breach of contract. It does not. The Fourth Circuit cases teach that the tort may be factually bound to the contractual breach but must have different legal elements. Such is the case here. There may be, and was, a degree of factual overlap in the proof, in that what went to show breach of contract also went to establish breach of fiduciary duty, but there is neither conceptual nor legal identity in the elements. For example, applying the reasoning of *Glaesner* and *Richland,* Zimmer's abrupt termination can be construed in terms of compliance with the terms of the contract as to termination, and it also becomes part of the proof of willful failure to act in Vanwyk's best interest contrary to equity and good conscience, yet the two claims are distinct. The breach of fiduciary duty which Vanwyk pleads, duty to act in good faith in Vanwyk's best interest, is factually and legally distinct from breach of contract. What we have here is simply more than can be captured in the category known as breach of contract, namely, an independent claim sounding in tort.

**3. Vanwyk's fraud claim does not reduce to breach of contract.**

 The amended complaint as to fraud reads, in relevant part:

50. With the intent to induce Vanwyk to allow Zimmer to maintain Vanwyk's full trust and confidence and permit Zimmer to hold itself out as Vanwyk's exclusive sales agent, Zimmer represented to Vanwyk that it was acting as Vanwyk's exclusive agent and not engaging in competitive activities against Vanwyk from June 1995 until September 26, 1995.

51. For example, on June 28, 1995, two weeks after secretly deciding to sell a dispensing system manufactured by Zimmer and one of Vanwyk's competitors, Ozark, to Springs, Zimmer wrote to Vanwyk stating, "we have not quoted any domestic equipment equivalent to Vanwyk. You get copies of all our quotations for color dispensing auxiliary equipment."

52. These representations by Zimmer to Vanwyk were false and material to the agreement between the parties.

53. At the time of making its representation, Zimmer knew that its representation was false and had no intention of honoring its representation.

54. Vanwyk reasonably relied and acted upon Zimmer's misrepresentation that it would not engage in competitive activities against Vanwyk by continuing to trust Zimmer to act as Vanwyk's exclusive agent and not employ other sales agents for the critical territories in the United States and Canada allocated to Zimmer.

55. As a direct and proximate result of Zimmer's misrepresentation to Vanwyk, Vanwyk has suffered injury and loss to its business in an amount to be proven at trial.

*Amended Complaint.*

Zimmer contends that the fraud claim, as pleaded, is another version of its contract/agency claim, and for that reason does not present a valid claim. The fraud claim is another version of the contract/agency claim because Vanwyk and Zimmer entered into a contractual agency agreement, as part of which Zimmer agreed not to compete with Vanwyk, and the fraud claim is simply another version of this same idea. Moreover, now that the jury has found that there was a contract, and in fact awarded the same compensatory damages for fraud and for breach of contract, Vanwyk's recovery should be in contract, not in fraud.

This case, as pleaded and proven, presents more than mere violation of a contract. There is much more here by way of factual basis, for example, than Duc's bald allegation that Orkin never intended to inspect, or Larry Fletcher's perfunctory on-the-spot reassurances upon which A & E Supply claimed reasonably to rely. In *A & E Supply,* fraud, "[a] familiar independent, wilful tort," could have been proven but was not. The fraud claim was not conceptually or legally incompatible with breach of insurance contract. Such is the case here. The alleged fraud is factually bound to the contractual breach, but its legal elements are distinct. Unlike *A & E*

*Supply,* the necessary evidence of fraud was present.

■ Under South Carolina law, the elements of fraud are (1) a representation, (2) its falsity, (3) its materiality, (4) either knowledge of its falsity or reckless disregard of its truth or falsity, (5) intent that the representation be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Ardis v. Cox,* 314 S.C. 512, 431 S.E.2d 267, 269 (App.1993); *Mishoe v. General Motors Acceptance Corp.,* 234 S.C. 182, 107 S.E.2d 43, 49 (1958). Nondisclosure is fraudulent when there is a duty to speak. *Manning v. Dial,* 271 S.C. 79, 245 S.E.2d 120 (1978); *Jacobson v. Yaschik,* 249 S.C. 577, 155 S.E.2d 601 (1967).

■ South Carolina law permits claims for fraud and breach of contract to be raised independently in the same action. *Floyd v. Country Squire Mobile Homes, Inc.,* 287 S.C. 51, 336 S.E.2d 502 (App.1985)("Our law has long recognized a plaintiff's right to recover punitive damages for breach of contract accompanied by a fraudulent act.") If a plaintiff may plead and prove breach of contract together with fraud and obtain a punitive damages instruction, it may plead and prove and recover each claim established independently.

Vanwyk presented evidence to the effect that Zimmer failed to disclose its sales to Springs and Glenoit Mills as was its duty under the contract and by virtue of its fiduciary relationship. Moreover, without disclosure, Zimmer ceased to use its best efforts to represent Vanwyk and began representing a competitor, Termoelettronica. These nondisclosures were material in that they were deliberately made with the intent that Vanwyk continue to believe that Zimmer was acting as its agent. Ignorant of these developments, Vanwyk, as was its right, to its detriment relied on Zimmer's representations, which were materially incomplete and false. In addition to failure to disclose, Zimmer affirmatively misrepresented to Vanwyk that Springs had decided not to purchase a dispensing system and that Zimmer had not quoted any domestic equipment equivalent to

that of Vanwyk. Under *Ardis,* Vanwyk made out a case of fraud, and Zimmer does not contest the jury's finding of fraud on the merits.

**B. Under South Carolina law, Vanwyk could advance its claim of breach of fiduciary duty under a theory of trust and under a theory of agency. Vanwyk presented substantial evidence upon which a reasonable jury could find breach of fiduciary duty arising from trust and arising from agency.**

Zimmer contends that as to breach of fiduciary duty, it is entitled to judgment as a matter of law on the merits. Zimmer's argument has two prongs. First, Zimmer contends that Vanwyk could not impose a fiduciary duty apart from agency. Second, Vanwyk could not impose a fiduciary duty through agency because Vanwyk failed to prove Zimmer was its agent under South Carolina law.

As to its first position, Zimmer argues that case law does not support the Court's instruction, which read in part that fiduciary duty may arise from a relationship that "may be moral, social, domestic, or merely personal." Rather, to have a fiduciary relationship, one party must be in a superior position of influence, enabling it to exercise influence over the other party, who reposes special trust and confidence. The law having to do with manufacturer-distributor relationships is designed around the premise that it is the manufacturer, not the distributor, who has the superior position. Thus, the law is designed to protect Zimmer's position, not Vanwyk's. There was no justification for Vanwyk to repose special confidence in Zimmer and no foundation for any belief that Zimmer would act as fiduciary in the inherently risky manufacturer-distributor relationship. According to Zimmer, no law supports the characterization of a manufacturer-distributor relationship as fiduciary.

Second, Vanwyk failed to prove Zimmer was its agent under South Carolina law, because Vanwyk failed to prove Zimmer had the power to bind Vanwyk so as to be its

agent. An agent must have power to contract, and Zimmer did not have that power, as admitted in ¶ 11 of the amended complaint.

**1. The Vanwyk–Zimmer relationship could properly be characterized as "fiduciary" based upon the trust and confidence which Vanwyk reposed in Zimmer.**

In *O'Shea v. Lesser*, 308 S.C. 10, 416 S.E.2d 629, 631 (1992), the South Carolina Supreme Court stated, "A fiduciary relationship exists when one reposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing confidence." The Court cited *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 358 S.E.2d 150 (App.1987), a suit by a car wash corporation against a former manager and supplier, alleging that the manager had conspired with the supplier to breach the manager's confidential relationship with the corporation and divert corporate funds. Therein, discussing fiduciary relationship, the Court stated:

> A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence.
>
> *Courts of equity have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring. 36A C.J.S. Fiduciary at 385 (1983).*

*Id.* 358 S.E.2d at 152 (emphasis supplied).

Further, in *Construction Techniques, Incorporated v. Dominske*, 928 F.2d 632 (4th Cir.1991), a suit brought in the District Court for the District of South Carolina by a former employer against a former employee and his wife alleging breach of fiduciary duty by holding an undisclosed ownership interest in the employer's main supplier, the Court stated:

> [T]he fiduciary relationship arises not only from the formal principal-agent contract, but also from informal relationships of trust.

*Id.* at 637–38.

In *Steele v. Victory Savings Bank*, 295 S.C. 290, 368 S.E.2d 91 (App.1988), in which the remitter of a cashier's check brought an action against the bank to whom the check was delivered for breach of fiduciary duty and conversion, the Court stated:

> A "fiduciary relationship" is founded on trust and confidence reposed by one person in the integrity and fidelity of another. It "exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." ... *Courts of equity have been careful to not define fiduciary relationships so as to exclude new cases that may give rise to the relationship ....* To constitute a fiduciary relationship, the relationship must be more than a casual relationship.

*Id.* 368 S.E.2d at 93 (citation omitted; emphasis supplied).

In *Burwell v. South Carolina National Bank*, 288 S.C. 34, 340 S.E.2d 786 (S.C.1986), a suit by the guarantor of a loan by a bank to an airline against the bank alleging fraud and breach of fiduciary duty, the South Carolina Supreme Court examined the question whether a normal bank-depositor arrangement creates a fiduciary relationship, and in so doing stated the general rule in the following terms:

> The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. 36A C.J.S. Fiduciary. (1961). As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his

own behalf, but in the interests of the other party. 36A C.J.S. Fiduciary (1961).

*Id.* 340 S.E.2d at 790.

■ Applying the teaching of these cases to the Vanwyk–Zimmer relationship, it is clear, first, that the respective roles of the parties as manufacturer and promoter/seller do not prevent the relationship from being properly described as fiduciary; nor does the fact that this relationship, like all business relationships, involves economic risks and the impact of changing business circumstances. Second, which party is in a superior position is a matter of evidence and not *a priori* category.

■ Third, the evidence before the jury was sufficient to permit the jury to find that Vanwyk reposed trust and confidence in Zimmer. Vanwyk's evidence tended to show that Vanwyk is a relatively small Dutch manufacturer dependent for the success of its American sales upon its exclusive relationship with Zimmer. Vanwyk's Roberts testified that Vanwyk trusted Zimmer completely to handle and promote Vanwyk's American business. Zimmer's witnesses testified that Zimmer acknowledged and accepted Vanwyk's trust. Zimmer's former president, Doujak, testified that he was aware that Vanwyk trusted Zimmer to handle its business and not sell competing products.

There was evidence sufficient for the jury to conclude that Zimmer was in a superior position to Vanwyk. Roland Zimmer, Zimmer's owner and president, testified that Zimmer had a customer base of several hundred companies and that Vanwyk "did not bring much to the table." Zimmer further testified Vanwyk provided no new customers to Zimmer and was always a "small part" of Zimmer's much larger business. Moreover, the size of Vanwyk's staff, Vanwyk's distance from the United States, and the exclusive nature of Vanwyk's relationship with Zimmer required it to rely upon Zimmer's good faith in fulfilling its duties.

Fourth, the jury was properly instructed under South Carolina law as to fiduciary duty. The instruction used the *O'Shea* test and explained that fiduciary relationships can arise outside of traditional categories such as agency.

**2. The Vanwyk–Zimmer relationship could properly be characterized as "fiduciary" based upon agency.**

Zimmer contends that Vanwyk failed to prove Zimmer was its agent under South Carolina law. According to Zimmer, under South Carolina law, an agent must have power to bind the principal in order to be an agent. Zimmer did not have the power to bind Vanwyk.

Zimmer relies primarily upon *Peeples v. Orkin Exterminating Company,* 244 S.C. 173, 135 S.E.2d 845 (1964), for its position that under South Carolina law, the power to contract is a necessary condition of agency. In that case, the South Carolina Supreme Court stated:

> Respondent maintains that the record supports the finding that Appellant has an agent and office in Hampton County for venue purposes. The arrangement between Ellis and Appellant where by Ellis answers the telephone and takes messages for Appellant is analogous to an answering service. A person performing the function of an answering service is not an agent within the meaning of the venue statutes. "An agent is one appointed by a principal as his representative and to whom the principal confides the management of some business to be transacted in the principal's name, or on his account, and who brings about or effects legal relationships between the principal and third parties." *State v. W. T. Rawleigh Company,* 172 S.C. 415, 174 S.E. 385; *Thompson v. Ford Motor Co.,* 200 S.C. 393, 21 S.E.2d 34. Ellis had no power to contract in Appellant's name, his entire authority was to answer the telephone and take message.

*Id.* 135 S.E.2d at 848.

More recent South Carolina cases have cited *Peeples* as authority for the proposition that having the power to contract is a sufficient condition for a finding of agency. In *State ex rel. McLeod v. C & L Corporation, Incorporated,* 280 S.C. 519, 313 S.E.2d 334, 338 (App.1984), in the context of examining

whether an independent contractor was an agent, the Court reasoned:

> An independent contractor can also be an agent; the two are not mutually exclusive.... One who is appointed to establish a contractual relationship between the principal and a third person is an agent. *Peeples v. Orkin Exterminating Co.,* ... Since Wayne Cooper was appointed by C & L to enter into sales contracts binding between C & L and third persons, the relationship here was undoubtedly one of agency.

*Id.* 313 S.E.2d at 338 (some citations omitted). As in *Peeples,* the Court does not say that power to contract is the one way an agency relationship can be shown, i.e., that power to contract is a sufficient *and necessary* condition of agency.

In *Palmer & Cay/Carswell, Inc. v. Condominium/Apartment Insurance Services, Inc.,* 306 S.C. 1, 409 S.E.2d 806 (App.1991), again in the context of examining whether an independent contractor was an agent, the Court reasoned:

> On the other hand, an independent contractor can be an agent.... Elsewhere in the document, C/AIS is referred to as Colonial Penn's "Manager." The document provides that Colonial Penn "appoints the Manager as its legal representative and true and lawful attorney to act in the Company's behalf." The document specifies that the duties of C/AIS include, among other things, the procuring, underwriting and servicing of binders, policies and contracts. C/AIS is specifically given "binding authority." "One who is appointed to establish a contractual relationship between the principal and a third person is an agent." ...

*Id.* 409 S.E.2d at 808 (citations omitted). C/AIS was given binding authority and was, therefore, an agent. Power to establish a contractual relationship is a sufficient condition of agency.

These holdings are in harmony with the South Carolina Supreme Court's older decision in *Thompson v. Ford Motor Co.,* 200 S.C. 393, 21 S.E.2d 34 (1942), wherein the Court, in the context of examining whether service was effected on a company's agent so as to support a personal judgment against it, reasoned from the general principle, which it articulated as follows:

> It is true that the power to contract for one's principal is strong evidence of agency, but it is only one means by which agency can be shown, and does not constitute the sole test as to its existence. Agency may be shown by the fact that a person represents his principal in some one or more of his relations to others, even though he lacks contractual power.

*Id.* 21 S.E.2d at 49–50.

Accordingly, in *Hester v. New Amsterdam Casualty Company,* 287 F.Supp. 957 (D.S.C. 1968), *affirmed as to liability but remanded for recomputation of damages,* 412 F.2d 505 (4th Cir.1969), the District Court applied South Carolina law to answer the question whether certain parties (Hall, Brassel, Smith, and Kelly), who acted to procure a buyer for property in Florida, were agents, and in so doing reasoned:

> South Carolina courts have defined an agent as:
>
> > [O]ne appointed by a principal as his representative and to whom the principal confides the management of some business to be transacted in the principal's name, or on his account, and who brings about or effects legal relationships between the principal and third parties. *State v. W.T. Rawleigh Company,* ..., *Thompson v. Ford Motor Co.,* ..., *Peeples v. Orkin Exterminating Company,* ....
>
> The court, therefore, concludes, as a matter of law, that Hall, Brassell, Kelly and Smith were agents of defendants Keith and Estelle Jones and the above named agents acted within the scope and extent of their authority in their effort to procure a purchaser of the land in Florida.

*Id.* at 976 (citations omitted).

These cases teach that under South Carolina law, the power to contract is a sufficient but not a necessary condition of agency. "Agency is a fiduciary relationship which results from the manifestation of consent by one person to another to be subject

to the control of the other and to act on his behalf." *Peoples Federal Savings & Loan Association v. Myrtle Beach Golf & Yacht Club,* 310 S.C. 132, 425 S.E.2d 764, 773 (App.1992)(citing Restatement (Second) of Agency § 1 (1958)). "An agreement may result in the creation of an agency relationship although the parties did not call it an agency and did not intend the consequences of the relationship to follow." *Id.* "Agency may be proved by circumstantial evidence showing a course of dealing between the two parties." *Id.*

■ Vanwyk presented substantial evidence upon which the jury could have, and did, as against Zimmer's evidence to the contrary, find that Zimmer was Vanwyk's agent under South Carolina law. Vanwyk's evidence showed that Zimmer acted on Vanwyk's behalf, represented Vanwyk to customers, and had authority to make binding commitments to customers for Vanwyk. Vanwyk's president, Roberts, testified that Zimmer often negotiated as to price and terms with prospective customers. Roberts kept control to the extent that he would give Zimmer authority to agree to a price within a given range, and Zimmer would negotiate the highest price within the range. Roland Zimmer testified that he used the phrase "full service agent" to describe Zimmer's relationship with Vanwyk when the relationship ended and that phrase imports power to bind the principal. Moreover, Zimmer kept a price list for smaller machines sold to complement Vanwyk's color dispensing systems and sold these machines without prior approval by Vanwyk. Zimmer, acting on behalf of Vanwyk, retained a security interest in equipment it sold to customers.

**C. By the standards of Rules 50 and 59, Fed.R.Civ.Pro., the jury's award of $200,000 in punitive damages was supported by substantial evidence, was not against the clear weight of the evidence, was not based upon evidence that was false, and will not result in a miscarriage of justice.**

**1. Standards**

**(a) South Carolina law**

■ Rules 50(b) and 59 are applied against a background of South Carolina law.

In *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991), the Court established an eight-factor post-trial review:

> Hereafter, to ensure that a punitive damage award is proper, the trial court shall conduct a post-trial review and may consider the following: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) as noted in [*Pacific Mutual Life Ins. Co. v.* ] *Haslip,* [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)] "other factors" deemed appropriate.

*Id.* 406 S.E.2d at 354. *Gamble* requires that "no award be grossly disproportionate to the severity of the offense ..." *Id.* Finally, *Gamble* states the following general principles:

> In South Carolina, "punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future." ... Moreover, they serve "as a vindication of private rights when it is proved that such have been wantonly, willfully or maliciously violated." ... Lastly, punitive damages may be awarded only upon a finding of actual damages. ...

*Gamble,* 406 S.E.2d at 354 (citations omitted). *Accord, Carter v. R.L. Jordan Oil Company, Inc.,* 301 S.C. 84, 390 S.E.2d 367, 368 (App.1990)(Evidence of simple negligence alone will not support an award of punitive damages.... "[T]here must be evidence the defendant's conduct was wilful, wanton, or in reckless disregard of the plaintiff's rights .... Conduct is wilful, wanton, or reckless when it is committed with a deliberate intention under such circumstances that a person of ordinary prudence would be conscious of it as an invasion of another's rights. It is the present consciousness of wrongdoing that

justifies the assessment of punitive damages against the tortfeasor." (citations omitted)).

In *South Carolina Farm Bureau Mutual Insurance Company v. Love Chevrolet, Inc.*, 324 S.C. 149, 478 S.E.2d 57 (1996), the Court applied *Gamble:*

> [A] punitive damage award is warranted only when the defendant's conduct is shown to be willful, wanton, or in reckless disregard of the rights of others....
>
> ....
>
> ...[T]here are now three stages in this state to a trial court's review of punitive damages. First, the court must determine whether the defendant's conduct rises to the level of culpability warranting a punitive damage award. If not, the issue of punitive damages may not be submitted to the jury. If so, the jury should be adequately instructed to assess an appropriate amount of damages. Second, the trial judge must conduct a post-trial *Gamble* review to ensure that the award does not deprive the defendant of due process. If the award is determined to violate the defendant's due process rights, then the trial court must either grant a new trial absolute, or a new trial nisi remittitur. If the award is determined not to violate the defendant's due process rights, then the trial court reaches the third inquiry, to wit, whether, in the exercise of its discretion, it finds the award excessive or inadequate. If the verdict is not excessive, it may stand. If the trial judge finds the award excessive or inadequate, he may grant a new trial nisi additur or remittitur.

*Id.* 478 S.E.2d at 58–59.

### (b) Fourth Circuit law

In *Mattison v. Dallas Carrier Corporation*, 947 F.2d 95 (4th Cir.1991), the Court discussed the standards appropriate to federal district court post-trial review of an award of punitive damages in diversity cases:

> "While a district court must apply the substantive law of the state when instructing the jury on punitive damages, ..., it must also apply the Federal Rules of Civil Procedure and, therefore, must review the jury verdict under standards established by Rules 50(b) ... and 59.... Moreover,

the review by a federal district court of a jury verdict is always subject to the Seventh Amendment constraints guaranteeing the right to a jury trial which are not imposed on any state-prescribed post-trial review. This division in the application of substantive state law and federal procedural law is specifically confirmed in *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, ...:

> In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered....
>
> ...the Seventh Amendment does not permit a federal court to substitute its judgment for that of a jury, as long as the jury operates within the constraints of the law and the evidence, ...
>
> ....
>
> The verdict is permitted to stand unless, under Rule 50(b), no substantial evidence is presented to support the award, ..., or, under Rule 59, the verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice."

*Id.* at 99–100 (citations omitted). *Accord, id.* at 107 (Because a new trial will be conducted in federal court, the new South Carolina procedures for post-trial review would not be applicable. Rather, the district court must apply Rules 50(b) and 59, which permit the court to interfere with a verdict, under Rule 50, only where no substantial evidence is offered on which the jury can base its award, and, under Rule 59, only where the verdict is "against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice." (citation omitted)).

The *Mattison* Court discusses the implications of the Seventh Amendment for post-trial review of an award of punitive damages as follows:

> The Seventh Amendment directs that facts decided by a jury may not be "re-exam-

ined" by a federal court, other than "according to the rules of common law." . . . . The right to jury trial secured by the Seventh Amendment thus reserves the weighing of evidence and the finding of facts exclusively to the jury. When a jury has not been presented with substantial evidence to make a finding, the finding can be reversed by the trial court. When the jury commits error in the application of the law, relies on facts not before it or bases its decision on improper motives, or reaches a result that is against the clear weight of the evidence or is manifestly unjust, the court may withdraw the case from that jury and order a trial before another jury. In either case, however, the court cannot, consistent with the Seventh Amendment, evaluate a jury's verdict based on evidence that the jury was not permitted to consider at trial or on a legal standard not given to the jury. These rights secured by the Seventh Amendment form the basis of current jurisprudence developed around Rules 50(b) and 59, Fed. R.Civ.Pro.

A *Haslip*-type post-trial review, insofar as it is a quasi de novo review by which the court reviews facts, some of which may not have been presented to the jury, would be inconsistent with the restrictions of the Seventh Amendment. When a factual issue is committed to the jury, as punitive damages are under federal law, . . ., the court cannot substitute its judgment for that of the jury. Rather, it can only grant a new trial, and then only under the standards permitted by federal law. . . .

*Id.* at 107–08 (citations omitted).

 "A federal court cannot apply the *Gamble* post-verdict review process." *Id.* However, South Carolina's *Gamble* standard for post-trial review should "be incorporated by the district court in its instructions to the jury." *Id.* at 109.

If the plaintiff demonstrates an entitlement to punitive damages, we direct that the district court's instructions on the amount of punitive damages that may be awarded include instruction on four aspects, which are derived from *Gamble* and *Haslip:*

(1) Relationship to harm caused: Any penalty imposed should take into account the reprehensibility of the conduct, the harm caused, the defendant's awareness of the conduct's wrongfulness, the duration of the conduct, and any concealment. Thus any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused, including the compensatory damage award made by the jury.

(2) Other penalties for the conduct: Any penalty imposed should take into account as a mitigating factor any penalty that may have been imposed or which may be imposed for the conduct involved, including any criminal or civil penalty or any other punitive damages award arising out of the same conduct.

(3) Improper profits and plaintiff's costs: The amount of any penalty may focus on depriving the defendant of profits derived from the improper conduct and on awarding the costs to the plaintiff of prosecuting the claim.

(4) Limitation based on ability to pay: Any penalty must be limited to punishment and may not effect economic bankruptcy. To this end, the ability of the defendant to pay any punitive award entered should be considered.

*Id.* at 109–110. *Accord, Barber v. Whirlpool Corporation,* 34 F.3d 1268, 1278 (4th Cir.1994)("Under South Carolina law, punitive damages are permissible where the conduct of the defendant was wilful, wanton or reckless; conscious wrongdoing must be proven. . . . [A] federal district court applying South Carolina law must rely on the [eight] factors set forth in *Gamble* . . . . The determination of damages is left to the discretion of the jury, to be reviewed by the district court in accordance with federal standards of review under Rule 50(b) and Rule 59. The award shall stand unless no substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice." (citation omitted)). *Accord, Atlas Food Systems and Serv. v. Crane Nat. Vendors,* 99 F.3d 587, 593–94 (4th Cir.1996). *Accord, Johnson v.*

*Hugo's Skateway,* 974 F.2d 1408, 1416 (4th Cir.1992) ("We thus conclude that if state law assigns the trial or appellate court a post-verdict role in assessing the reasonableness of a punitive damages award and specifies certain factors to be considered in making that assessment, then this body of substantive law must also be applied in federal court, but in a manner that permits consideration by *the jury* as the sole fact finder, rather than by the judge." (emphasis in original)).

In *Atlas Food Systems* the Court provided guidance for applying Rule 59 to punitive damage awards:

[The] Rule 59 standards are well established in the Fourth Circuit:

On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

. . . .

[W]e ... examine more closely our three-pronged Rule 59 standard and the role served by each prong. The first two prongs require a district court to determine purely factual questions: whether the jury's damages award is (1) "against the weight of the evidence" or (2) "based upon evidence which is false." ... This review encompasses a comparison of the factual record and the verdict to determine their compatibility. Consequently, jury determinations of factual matters such as liability on a cause of action, liability for compensatory and punitive damages, and the amount of compensatory damages will be reviewed by determining whether the jury's verdict is against the weight of the evidence or based on evidence which is false. The jury's determination of the amount of punitive damages, however, is not a factual determination about the degree of injury but is, rather, an almost unconstrained judgment or policy choice about the severity of the penalty to be imposed, given the jury's underlying factual determinations about the defendant's conduct. Because the factual record provides no direct foundation for the *amount* of punitive damages, a review of the size of the jury's award best utilizes the third prong of the Rule 59 review standard—whether the jury's award will result in a miscarriage of justice.... The miscarriage-of-justice standard recognizes the hybrid nature of punitive damage awards. As South Carolina's punitive damages test illustrates, some considerations underlying the *amount* of a punitive damage award may be factual—e.g., the defendant's ability to pay—and, therefore, would be well suited to the jury's role of finding facts. But other policy-related elements—e.g., the likelihood that an award will deter the defendant or others from engaging in similar conduct—are not factual questions and, therefore, are more appropriately decided by the trial judge....

. . . .

Accordingly, we conclude that while a jury is authorized to award punitive damages on a framework of liability and the factors supplied by state law, the judgment a jury makes as to the *amount* is reviewable by federal trial courts under Federal Rule of Civil Procedure 59 less deferentially than are factual findings which may be measured against the factual record. The court's review of the amount of a punitive damages award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice.

*Id.* at 594–95 (citations omitted; emphasis in original).

## 2. Analysis and conclusions

### (a) The jury was properly instructed under *Mattison* and *Gamble.*

Although Zimmer does not contest the instruction, review is necessary to a complete analysis. The jury was instructed, according to Zimmer's proposed instruction, as follows:

Punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future. Moreover, they

serve as a vindication of private rights when it is proved that such have been wantonly, willfully or maliciously violated.

In order to award punitive damages, you must determine that Vanwyk has proved its entitlement to such damages by clear and convincing evidence.

In order to award punitive damages, you must find that Vanwyk has proved by clear and convincing evidence that the conduct of Zimmer was willful, wanton or malicious and, in particular, you must find that Vanwyk has proved by clear and convincing evidence that Zimmer's conduct included a consciousness of wrongdoing at the time of the conduct.

Punitive damages may be awarded only if actual damages are awarded.

If you find that Vanwyk has proven its entitlement to punitive damages by clear and convincing evidence and have decided to award punitive damages, you must decide what amount of punitive damages to award. In deciding the amount of punitive damages to award, you should consider the following:

1. Zimmer's degree of culpability;

2. The duration of Zimmer's conduct;

3. Zimmer's awareness or concealment of its conduct;

4. The existence of similar past conduct by Zimmer;

5. The likelihood that your punitive damages award will deter Zimmer or others from like conduct.

6. Whether your award is reasonably related to the harm likely to result from such conduct; and

7. Zimmer's ability to pay.

■ Thus, the jury was instructed that any penalty imposed should bear a relationship to the nature and extent of the conduct and the harm caused, including the compensatory damage award made by the jury, in light of what would deter, and considering Zimmer's ability to pay. This instruction satisfies *Gamble* and, on the facts of this case, *Mattison.*

**(b) Substantial evidence was presented to support the award of punitive damages.**

The award of punitive damages was made in answer to the following question:

If you answered "YES" to either the issue of breach of fiduciary duty or the issue of fraud, then do you find that the Defendants are liable for punitive damages, and if so, in what amount?

■ Hence, the award was based on either breach of fiduciary duty or fraud or both. As Judge Ervin cautions in *Barber,* we must ask if substantial evidence was presented with respect to both. *Barber,* 34 F.3d at 1279. The undersigned concludes that as to each of the two claims, substantial evidence was presented.

*Breach of fiduciary duty.* (1) Arising from trust. Vanwyk presented evidence to the effect that Vanwyk, a relatively small Dutch manufacturer with a limited staff geographically removed from the United States, relied upon its exclusive relationship with Zimmer and trusted Zimmer, which had a customer base of several hundred companies, to promote and sell Vanwyk equipment in the large American market, and Zimmer acknowledged and accepted Vanwyk's trust. Vanwyk's exclusive reliance upon Zimmer extended to information about how Zimmer was handling its responsibilities. Only in the course of an accidental meeting at ITMA between Springs' Starnes and Vanwyk's Roberts did Vanwyk learn Zimmer had sold competitive products.

(2) Arising from agency. Vanwyk presented evidence that Zimmer acted on Vanwyk's behalf, representing Vanwyk in promoting and selling to customers and in ongoing customer relationships. Vanwyk presented evidence that Zimmer was routinely given the power to make binding commitments on Vanwyk's behalf. Vanwyk's Roberts testified that price and term negotiations were often handled directly by Zimmer. Roberts would give Zimmer authority to agree to a price within a range, and Zimmer would negotiate the highest price within the range. Mr. Zimmer testified that Zimmer used the phrase "full service agent" to describe its relationship with

Vanwyk near the end of the relationship. Zimmer sold auxiliary equipment to Vanwyk's color dispensing systems without prior approval from Vanwyk. Zimmer retained a security interest in equipment sold.

Vanwyk presented evidence that Zimmer breached its fiduciary duty by selling competing equipment without notice to Vanwyk. Again without notice to Vanwyk, Zimmer ceased to sell Vanwyk equipment except as a last resort. Again without notice to Vanwyk, Zimmer began representing another manufacturer in August, 1995, but terminated its seven-year relationship with Vanwyk almost two months later, on the eve of the quadrennial ITMA show, when Vanwyk did not have time to make other arrangements, and Zimmer could advance the interests of Termoelettronica, as with Twin Rivers.

*Fraud.* Zimmer does not contest the jury's finding of fraud on the merits. Vanwyk presented evidence of Zimmer's undisclosed promotion and sales of competing equipment during the summer of 1995 as regards Springs Industries, Glenoit Mills, and U.S. Dyeing & Finishing, giving a reasonable jury sufficient basis to find fraud.

**(c) The award of punitive damages is not against the clear weight of the evidence or based upon evidence that is false.**

*Atlas Food Systems* teaches that the first two Rule 59 prongs be considered in tandem. Comparing the factual record, the evidence presented by both Zimmer and Vanwyk, and the verdict, the jury's finding of breach of fiduciary duty and fraud does not stand against the clear weight of the evidence. Nor does a finding of willfulness offend the clear weight of the evidence. The evidence of breach of fiduciary duty and fraud clearly point to willful, undisclosed diversion of Vanwyk's sales opportunities despite a seven-year exclusive representation relationship. Vanwyk's evidence was not shown to be false.

**(d) The award of punitive damages will not result in a miscarriage of justice.**

■ A jury is authorized to award punitive damages on a framework of liability and factors supplied by state law. Here, the jury returned a punitive damages award of $200,000. *Atlas Systems* teaches that the court's review of the *amount* of a punitive damages award should involve comparison of the court's independent judgment as to what amount would be appropriate with the jury's award to determine whether the jury's award is so excessive as to work an injustice.

**(i) Degree of reprehensibility**

■ Ongoing and willful deceit is, and ought to be, a basis for an award of punitive damages. *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996)(" 'Trickery and deceit' is more reprehensible than negligence."). However, the deceit which the jury found to have been established was purely economic in nature. It did not evince indifference to or reckless disregard of the health and safety of others. "To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, . . ., or when the target is financially vulnerable, can warrant a substantial penalty. But this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." *Id.* (citation omitted).

■ The continuing nature of the conduct is a relevant consideration. "Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Id.*

Deliberate dishonesty is a further factor to be taken into account. *See, id.* at 1601.

■ In *BMW* the Court considered whether an award of punitive damages was "grossly excessive" so as to violate Fourteenth Amendment due process. No such question is at stake here. Nevertheless, Vanwyk's evidence provided a substantial basis for a finding of ongoing and deliberate dishonesty inflicting economic injury, supporting Vanwyk's contention that the award of punitive damages was necessary to cure Zimmer's disrespect for the law. In light of

*BMW*'s standards, it was no miscarriage of justice that the jury concluded that Zimmer's behavior was sufficiently reprehensible to require some exemplary award.

Vanwyk presented evidence that Zimmer's wrongful conduct lasted from June through September, 1995, and was carried out with the knowledge of Zimmer's president, Doujak. Zimmer secretly sold its own products to Springs despite its exclusive seven-year relationship with Vanwyk. When Roberts inquired as to the status of the Springs order, Zimmer concealed and misrepresented the nature of the negotiations, and Zimmer's office manager and corporate secretary assured Vanwyk shortly thereafter that Vanwyk received all quotations. Zimmer sold a competitor's system to Glenoit Mills without telling Vanwyk of that sales prospect. Shortly thereafter, Zimmer, without telling Vanwyk, marked up a Vanwyk quotation for another customer in an effort to sell a dispensing system to U.S. Dyeing & Finishing. While Zimmer encouraged Vanwyk to believe that the exclusive relationship continued, Zimmer secretly arranged to begin representing Termoelettronica and offered Vanwyk products if there was "no other option." Zimmer informed Vanwyk of its intent to terminate the relationship on the eve of the ITMA trade show, which occurs once every four years, leaving Vanwyk inadequate time to find a replacement and thus placing Vanwyk at a disadvantage.

### (ii) Ratio

 *BMW* teaches that the ratio of an exemplary award to the actual harm inflicted is an indicium of reasonability. *Id.* 116 S.Ct. at 1601. Accordingly, we consider whether the amount of this exemplary award bears a reasonable relationship to compensatory damages. "[T]he proper inquiry is whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 1602 (citation and internal quotation marks omitted; emphasis in original).

*Harm likely to result.* Vanwyk states that in consequence of Zimmer's passing off at Springs, Vanwyk has lost future opportunities to sell and repair equipment at Springs and to use Springs as a reference. The evidence does not quantify this loss nor point to other sources of future loss.

*Harm actually done.* The jury awarded Vanwyk compensatory breach of fiduciary duty damages in the following amounts: Glenoit Mills, $27,866; Twin Rivers Textiles, $83,071; and Springs Industries, $29,887. Having determined "by clear, cogent and convincing evidence" that Zimmer committed fraud on Vanwyk, the jury awarded Vanwyk compensatory fraud damages in the following amounts: Glenoit Mills, $27,866; Twin Rivers Textiles, $1.00; and Springs Industries, $29,887. The total compensatory damages for breach of fiduciary duty were $140,824. The total compensatory damages for fraud were $57,754. Eliminating double recoveries, the award for breach of fiduciary duty and fraud was $140,824.

 The ratio of the $200,000 exemplary award to the compensatory award (1.42 times damages) is not "shockingly dispar[ate]," *BMW*, 116 S.Ct. at 1602 n. 34, and does not account for future harm. By caselaw standards, it is reasonably related to the harm.

### (iii) Deterrence

*Specific deterrence.* Based on the evidence, we ask if this medicine is strong enough to cure Zimmer's disrespect for the law. The undersigned concludes that it is. It must be kept in mind that, per Vanwyk's evidence, buying textile equipment is an important and large capital expenditure for firms in that market. Prices run regularly in excess of one million dollars, and profits per sale can exceed one hundred thousand dollars. It must also be kept in mind that Vanwyk demonstrated a pattern of deliberate dishonesty toward Vanwyk of several months' duration. On the other hand, there was no showing that fraud or deceit characterized Zimmer's dealings with other businesses or in other markets. Nor is there an evidentiary basis for the supposition that this punitive damage award would fail to deter Zimmer from future wrongful conduct.

*General deterrence.* No evidence was presented of a need to punish Zimmer in order

to deter others in Zimmer's position from fraud or breach of fiduciary duty.

Zimmer's conduct rises to the level of culpability warranting a punitive damages award because it was committed with deliberate intent under circumstances that a person of ordinary prudence would be conscious of invading another's rights. Considered as to amount, a $200,000 exemplary award is not excessive so as to work an injustice. It reflects, but does not overstate, the degree of reprehensibility, and is reasonably proportioned to harm as measured by the amount of compensation. The award of punitive damages does not justify judgment as a matter of law or new trial under the standards of Rules 50 and 59, inasmuch as there was substantial evidence and the award was not against its clear weight, or based upon evidence which was false, and will not result in a miscarriage of justice.

### D. Zimmer's constitutionality argument as to punitive damages

For the first time, Zimmer argues that the award of punitive damages is unconstitutional because Vanwyk did not present evidence of Zimmer's ability to pay. Since the jury must be instructed as to the *Gamble* factors, and since one of the *Gamble* factors is Zimmer's ability to pay, then the jury was required to consider Zimmer's ability to pay. According to Zimmer, Vanwyk afforded the jury no basis for such consideration.

### 1. Zimmer's failure to raise this issue in its motion for directed verdict during the trial precludes its reliance on the issue in its motion for judgment as a matter of law.

■■■ To raise an issue in a motion for judgment as a matter of law, a party must preserve that right by first making an appropriate motion for directed verdict. *Rule 50(b), Fed.R.Civ.Pro.; Austin–Westshore Constr. Co. v. Federated Dep't Stores, Inc.,* 934 F.2d 1217, 1222 (11th Cir.1991). "The requirement of a proper directed verdict motion as foundation for a motion for judgment n.o.v. under Fed.R.Civ.P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation." *Miller*

*v. Premier Corp.,* 608 F.2d 973, 979 n. 3 (4th Cir.1979).

Having failed to raise this issue in its pre-verdict motion, Zimmer is precluded from raising it post-verdict.

### 2. The award is not unconstitutional for the reason Zimmer advances.

■■■ The burden of showing ability to pay rested upon Zimmer. In *Hutchinson v. Stuckey,* 952 F.2d 1418 (D.C.Cir.1992), the Court stated:

> Appellee Reedy argues that the punitive damage award cannot stand because it "had no relationship whatsoever to his financial position." ... It is true that an award of punitive damages should be related to the defendant's ability to pay, ..., and should be adjusted if clearly excessive in light of that factor, .... Nevertheless, the weight of authority places on *the defendant* the burden of producing evidence of his own financial condition if he wishes it considered by the jury. *See Smith v. Lightning Bolt Productions,* 861 F.2d 363, 373 (2d Cir.1988) ("it is the defendant's burden to show that his financial circumstances warrant a limitation of [a punitive damage] award" (citing *Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir.1978))); *Woods–Drake v. Lundy,* 667 F.2d 1198, 1203 n. 9 (5th Cir.1982) ("we adopt the rule that it is defendant, and not plaintiff, who must carry the burden of introducing evidence of net worth if defendant wishes these facts to be considered in awarding punitive damages"); ....

*Id.* at 1422 n. 4 (some citations omitted; emphasis in original).

In light of the above authority, the award of punitive damages is not unconstitutional because, and assuming, Vanwyk did not prove ability to pay. It should be noted that Vanwyk presented evidence of Zimmer's assets and growth, e.g., that Zimmer invested over $1,000,000 in plant equipment and added 50 employees in 1993.

### E. Conclusions as to punitive damages

■■■ Under Fourth Circuit law, a punitive damages award is to stand unless no

substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice. The Court is not allowed to substitute its judgment for that of the jury. Each of these factors has been analyzed above, and it was determined that substantial evidence supports the award, the award is not against the clear weight of evidence nor based upon false evidence, and the award will not miscarry justice. For these reasons, elaborated above, the undersigned concludes that Zimmer's Rules 50(b) and 59 motions as to punitive damages should be denied.

## IV. Lanham Act

Zimmer urges judgment as a matter of law on Vanwyk's passing off claim because Vanwyk did not prove secondary meaning and the Court did not instruct the jury that secondary meaning was required. Secondary meaning is necessary to a descriptive mark qualifying for federal trademark protection, and is shown by proving factors, as in *Perini Corporation v. Perini Construction, Inc.*, 915 F.2d 121, 125 (4th Cir.1990). Vanwyk did not offer proof of those factors, or otherwise show secondary meaning. Therefore, Vanwyk did not establish secondary meaning, its mark does not qualify for federal trademark protection, and it has no Lanham Act recourse. Vanwyk rejoins that Lanham Act passing off does not require a formal showing of secondary meaning. It suffices that, considering all circumstances, Zimmer's conduct was likely to deceive Springs into believing it was buying a Vanwyk system.

### A. Formal proof of secondary meaning was not required.

Most Section 43(a) actions arise out of trademark infringement, under circumstances where other Lanham Act provisions are unavailable. Registration being prerequisite to Section 32 infringement claims, the various requirements of Sections 1, 2, and 23 of the Act indirectly come into play. The standards for determining infringement are similar under Sections 32 and 43(a), namely, whether the marks or symbols are sufficiently similar to cause reasonable likelihood of confusion or deception of the consuming public.

Section 43(a) also provides that claims may be brought for "a false designation of origin" or a "false description or representation" by "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." There is no requirement that the plaintiff first obtain federal registration for the mark or that the mark meet federal registration requirements.

The statute encompasses various forms of "passing off," including actual appropriation of a plaintiff's mark and mislabeling its own product, intending that consumers believe that it originates with the plaintiff. *See, e.g., Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1356–57 (11th Cir. 1983); *Lacoste Alligator, S.A. v. Bluestein's Men's Wear*, 569 F.Supp. 491, 498–99 (D.S.C. 1983). It addresses misrepresentation by defendant's sales personnel, falsely implying a connection with plaintiff or reselling plaintiff's trademarked product. *See, e.g., Purolator, Inc. v. Efra Distribs.*, 524 F.Supp. 471, 478–79 (D.P.R.1981), *aff'd*, 687 F.2d 554 (1st Cir.1982).

Generic marks are not registrable as trademarks. However, Section 2 of the Lanham Act permits registration of a descriptive mark if it "has become distinctive of the applicant's goods in commerce." §§ 2(e), (f), 15 U.S.C. §§ 1052(e), (f). The distinctiveness thus acquired is termed "secondary meaning." "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Although the term "secondary meaning" does not appear in the section, courts have applied it to Section 43(a) infringement actions. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

At issue here is whether Section 43(a) passing off claims, as distinct from infringement claims, require formal proof of second-

ary meaning. Courts have extended Section 43(a) protection against passing off to generic terms

> if consumer confusion or a likelihood of consumer confusion arose from the failure of the defendant to adequately identify itself as the source of the product. Thus section 43(a) may not protect the use of a term unless that term is sufficiently distinctive to warrant protection as a trademark, even if some confusion results, but may offer protection against "passing off."
>
> . . . .
>
> Passing off is a type of fraud. We have defined it as trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off.

*Liquid Controls Corporation v. Liquid Control Corporation,* 802 F.2d 934, 939–40 (7th Cir.1986).

In *Blinded Veterans Association v. Blinded American Veterans Foundation,* 872 F.2d 1035 (C.A.D.C.1989), the Hon. (now Justice) Ruth Bader Ginsburg stated that "a generic term with de facto secondary meaning may be protected against passing off," *id.* at 1045 n. 22, and further:

> Because we have ruled out the question of trademark protection, BVA is not called upon to show "secondary meaning" in that setting. BVA nevertheless must show, analogously, what has been called "de facto secondary meaning"—i.e., that people associate the generic term "blinded veterans" with BVA.

*Id.* at 1045 n. 24.

Even if *de facto* secondary meaning is required for passing off cases pigeonholed as "false designation of origin," proof of secondary meaning has not been required under a claim of "false description or representation" by a court which inflexibly insisted on proof of secondary meaning under the "false designation of origin" language. "[I]f the action had been pursued as one for false description or representation ... admittedly the concepts of secondary meaning and nonfunctionality [would not be] relevant...." *Vibrant Sales v. New Body Boutique, Inc.,* 652 F.2d

299, 303 n. 3 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). *See also, Gimix, Inc. v. J S & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983).

Moreover, an absolute requirement of proof of secondary meaning is analytically unnecessary. If a plaintiff establishes consumer confusion, the plaintiff has, in effect, proven public symbol association. This would be the case, *a fortiori,* where the plaintiff shows that the defendant, presumably thinking consumers associated the mark with the plaintiff and that there was profit to be had from trading on that association, intended to deceive the relevant public into believing the product originated with the plaintiff.

Analogously, in *Kramer Manufacturing Co., Inc. v. Andrews,* 783 F.2d 421 (4th Cir. 1986), a trade dress infringement action which included a Section 43(a) false designation of origin claim, the Court, held the evidence of intentional copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant to prove that the plaintiff's product had not acquired secondary meaning, and in its careful discussion of case law on the issue of trade dress infringement, stated:

> The issue with which we are faced is the effect of a showing that the defendant deliberately copied the plaintiff's trade dress . . . . .
>
> Some courts have held that evidence of "palming off," or an intentional effort to induce retailers to substitute his product for other products requested by consumers, is presumptive proof of secondary meaning. . . . . For trademark infringement, the courts have held that evidence of deliberate copying establishes a prima facie case of secondary meaning, subject to rebuttal by the defendant, with the defendant bearing the ultimate burden of proof once deliberate copying is proven. . . . The rationale for this presumption is that when a defendant copies the trademark of a competitor, it is likely that he intended to appropriate some commercial advantage or benefit that his competitor derived from the use of the mark. . . . .

*Id.,* 783 F.2d at 449. Other courts have concluded that intentional copying constitutes important but not conclusive evidence that a mark has acquired secondary meaning. *See, e.g., Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1225–29 (2d Cir.1987); *Exxon Corp. v. Texas Motor Exch.,* 628 F.2d 500, 506 (5th Cir.1980).

▓▓▓▓ In sum, Section 43(a) protection against passing off extends even to generic terms where there is proof of de facto secondary meaning. Moreover, to the extent Vanwyk's claim is construed as one for false description or representation, secondary meaning was not relevant.[5] In light of the above, the jury instruction on this Lanham Act claim of actual passing off was accurate and did not result in fundamental unfairness to Zimmer. It contemplated that there had to be an association, which is the core requirement for secondary meaning, such that Springs associated the Direct Compact Dispenser with Vanwyk by virtue of how it was presented to them. Further, as discussed in the next section, there was ample evidence of secondary meaning presented, rendering harmless any failure in the secondary meaning instruction.

### B. *De facto* secondary meaning was shown.

▓▓▓▓ Vanwyk offered evidence upon which the jury properly could find that the relevant public associated the terms "DCD" and "Direct Compact Dispenser" with Vanwyk, and so, under the standard of *Blinded Veterans,* showed *de facto* secondary meaning. Zimmer's then-president, Doujak, admitted in his deposition that "DCD" was Vanwyk's "trade name" for its color dispensing system. Zimmer's product manager for Vanwyk's products, Gerlach, testified at trial that Vanwyk had been using the DCD name for many years and, although dozens of companies sell color dispensing systems, he knew of no company other than Vanwyk that used Direct Compact Dispenser or DCD to describe its dispensing system. Vanwyk's president, Roberts, and Gerlach testified that these products were known generically as "color dispensing systems." Roberts testified that "DCD" and "Direct Compact Dispenser" were marks used exclusively by Vanwyk to designate its products and that the names had become associated with Vanwyk in the industry. Springs' plant engineer Starnes testified in deposition that "the purchase order referred to the DCD Type 18P dispenser, which I believe to be Vanwyk." Starnes Dep. at 27. Zimmer advertised the "DCD" and "Direct Compact Dispenser" marks for Vanwyk. Finally, Gerlach deleted the term "DCD" when marking out a Vanwyk quotation when he was attempting to sell a competitive system to Springs.

### C. Zimmer is not entitled to judgment as a matter of law or new trial on the Lanham Act claim.

Reviewing the evidence in a light most favorable to Vanwyk, and without weighing credibility, there is a legally sufficient evidentiary basis for a reasonable jury to have found for Vanwyk on the passing off claim. Therefore, Zimmer is not entitled to judgment as a matter of law on the issue.

Since the verdict is not against the clear weight of the evidence, nor based upon false evidence, nor will it miscarry justice, Zimmer is not entitled to a new trial on the Lanham Act claim.

### D. Lanham Act damages should not be trebled, and attorneys' fees should not be awarded.

#### 1. Treble damages

▓▓▓▓ Section 35(a) of the Lanham Act "authorizes a court to award up to three

---

5. Vanwyk's amended complaint sets forth its claim for passing off under both prongs, false designation of origin and false description or representation:

 44. Zimmer offered for sale, sold, manufactured and delivered equipment to Springs representing that such equipment would be and was manufactured by Vanwyk, when in fact it was not.

 45. Zimmer's conduct, as described above, constitutes "passing off" another product as

Vanwyk's and the use of false designations of origin, descriptions and representations in violation of 15 U.S.C. § 1125(a).

 46. Zimmer's conduct has created confusion among members of the general public as to the origin of the equipment Zimmer has offered for sale, manufactured and/or distributed.

 47. Zimmer's conduct as described above was willful and intentional.

**380**

times a plaintiff's actual and proven damages so long as the result is compensatory, not punitive." *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 997 F.2d 949, 955 (D.C.Cir.1993). The statute itself requires that any sum in excess of actual damages must "constitute compensation and not a penalty." 15 U.S.C. § 1117(a). "An enhancement is appropriate to compensate a Lanham Act plaintiff only for such adverse effects as can neither be dismissed as speculative nor precisely calculated.... Lost profits and market distortion are, however, appropriate bases for the catch-all enhancement contemplated by § 35(a)." *Id.* "[T]he plaintiff's provable damages are the benchmark for determining whether an award constitutes compensation or whether it is a penalty." *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1157 (7th Cir.1994). An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive. *Taco Cabana Intern., Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1127 (5th Cir.1991). *Accord, Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d at 1157("Under this section any recovery to the plaintiff must constitute 'compensation' for its own losses or for the defendant's unjust enrichment; section 1117(a) (unlike section 1117(b)) does not allow a 'penalty' against the defendant."); *accord, BASF Corp. v. Old World Trading Co., Inc.,* 41 F.3d 1081, 1092 (7th Cir.1994).

▮▮▮ However, enhancement can, "consistent with the 'principles of equity' promoted in Section 35, provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *Id.* An example cited in *Taco Cabana* is where the "record strongly indicates that plaintiff's damages and defendant's profits were both greater than the amounts conclusively proven." *Id., citing Playboy Enterprises, Inc. v. P.K. Sorren Export Co.,* 546 F.Supp. 987, 998–99 (S.D.Fla.1982). Thus, in *Taco Cabana,* the Court found that "Two Pesos brazenly copied Taco Cabana's successful trade dress, and proceeded to expand in a manner that foreclosed several lucrative markets within Taco Cabana's natural zone of expansion." *Id.* at 1127 n. 20. Moreover,

deterrence can be an acceptable reason for enhancement. *Sands, Taylor & Wood v. Quaker Oats Co.,* 34 F.3d 1340, 1348 (7th Cir.1994)("Consequently, the courts have required that the final remedy imposed under section 35(a) provide a sufficient deterrent to ensure that the guilty party will not return to its former ways and once again pollute the marketplace.")

▮▮▮ "[T]he trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party." *Id., citing Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,* 692 F.2d 1272, 1274 (9th Cir.1982). But again, in this regard, "the monetary relief granted by the district court must be great enough to further the statute's goal of discouraging trademark infringement but must not be so large as to constitute a penalty." *Sands,* 34 F.3d at 1349, *quoting Otis Clapp & Son, Inc. v. Filmore Vitamin Co.,* 754 F.2d 738, 744 (7th Cir.1985).

▮▮▮ The jury awarded Vanwyk $29,887 in damages for the single instance of Zimmer's passing off its own product as Vanwyk's. Vanwyk had argued that its total lost profit from violation of the Lanham Act was, in fact, $29,887. Vanwyk seeks trebling on the grounds that it is undercompensated by the amount awarded and that as it stands, Zimmer will profit from its wrong.

The undersigned concludes that Vanwyk is not undercompensated by the award of the amount it urged upon the jury as the full amount of its lost profit. Admitting that its additional damages "are real but difficult to quantify," Vanwyk now argues that it is undercompensated because the $29,887 figure does not account for lost future opportunities at Springs, including service and spare parts, and loss of Springs as a reference site. The evidence introduced at trial does not provide a basis for concluding that opportunities at Springs or elsewhere would be lost or would be lost because of Zimmer's passing off or because Zimmer got its foot in Springs' door, or for reliably estimating the value of these future opportunities at Springs or of loss of Springs as a reference site. They are specu-

lative and do not provide a sound basis for exercise of the Court's equitable discretion.

Vanwyk further contends that trebling is necessary to deter Zimmer. Vanwyk's position is that Zimmer made nearly $20,000 in net profit, computed as revenues less all actual costs, on its sale of the system and, in addition, received credit for a sales commission of $4,300 in Vanwyk's calculation of lost profits. Thus, an award of $29,887 would not be sufficient to deter Zimmer from passing off in the future.

■ Vanwyk's premise is that an award sufficient to render Zimmer's violation unprofitable would not suffice to deter. The record provided a reasonable basis for the jury to conclude that Zimmer passed off its system as Vanwyk's to Springs. It does not establish a pattern, or even more than one instance, of passing off. Justifying an award based upon deterrence requires a basis for concluding what is past is prologue, and there is no such basis here; absent which, the award would be punitive, and that is not permitted.

Accordingly, the Lanham Act damages will not be enhanced.

### 2. Attorney's fees

■ In *Microsoft Corporation v. Grey Computer,* 910 F.Supp. 1077 (D.Md.1995), a copyright and trademark infringement and Lanham Act suit involving the distribution of 45, 848 units of counterfeit Microsoft software products, the Plaintiff sought attorneys' fees. Setting forth the standard, the Court stated:

> Where a case is exceptional, the Court may also award reasonable attorneys' fees. 15 U.S.C. § 1117. Courts have held that "[a] trademark case is exceptional for purposes of an award of attorneys' fees where the infringement is malicious, fraudulent, deliberate or wilful." .... "Typically, attorneys' fees cases involve deliberate attempts by the defendant to pass off its goods as those of the plaintiff by applying plaintiff's trademark to defendant's goods."

*Id.* at 1093. The Court defined willful as having knowledge that one's conduct constitutes infringement or showing a reckless disregard for the owner's rights. *Id.* at

1091. The decision to grant attorneys' fees in such exceptional cases rests within the discretion of the trial judge. *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 108 n. 6 (4th Cir.1991). The court should decide whether a case is exceptional by examining all the facts and circumstances, and the prevailing party must demonstrate the exceptional nature of the case by clear and convincing evidence before the court should decide whether to make the award. *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 65 (5th Cir.1992); *Machinery Corp. of Am. v. Gullfiber AB,* 774 F.2d 467, 472–73 (Fed.Cir.1985).

In order for the trial court to exercise its discretion and award attorneys' fees, the Fourth Circuit has interpreted Section 1117 to require that a prevailing plaintiff "show that the defendant acted in bad faith." *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 599 (4th Cir.), *cert. denied,* 506 U.S. 862, 113 S.Ct. 181, 121 L.Ed.2d 126 (1992). In reaching this conclusion, the Fourth Circuit relied upon legislative history referring to acts characterized as "malicious, fraudulent, deliberate and wilful." *Id.* at 600.

■ Willfulness in performing the act, e.g., of copying, does not necessarily mean willfulness in violating the law. *Badger Meter, Inc. v. Grinnell Corp.,* 13 F.3d 1145, 1159–60 (7th Cir.1994)("We do not agree that intentionally copying a competitor's product, even if this is later determined to involve trade dress infringement, by itself constitutes 'willful' infringement, nor do cases from this Circuit support such a position.... That Hersey deliberately copied Badger's meter does not entail that Hersey deliberately infringed on Badger's trade dress."). Willfulness in violating the law may qualify the case as exceptional. *Id.* ("[C]ases that refuse to award attorneys' fees under 15 U.S.C. § 1117(a) might involve deliberate copying of a competitor's product, but do not involve purposeful infringement of the competitor's trademark or trade dress.")

At least in the Seventh Circuit, willfulness in violating the law is a necessary but not sufficient condition for an award of attorneys'

fees premised upon willfulness. The *Badger* Court seems to insert "and" for "or" in the formulation "malicious, fraudulent, deliberate or willful." This would accord with the formulation in the Senate Report. *S.Rep.No. 1400, 93rd Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7132, 7136, and cited in Scotch Whisky Ass'n,* 958 F.2d at 599, noted above ("It would be unconscionable not to provide a complete remedy including attorney fees for acts which courts have characterized as malicious, fraudulent, deliberate and willful.") Thus, "[c]ases that award attorneys' fees under 15 U.S.C. § 1117(a) involve truly egregious, purposeful infringement, or other purposeful wrongdoing." *Badger,* 13 F.3d at 1159. The wrongdoing must be willful and egregious. Examples cited by the *Badger* Court involve continuing to use the trademark after losing in the infringement action and intending by the wrongdoing to put the plaintiff out of business. *Accord, Texas Pig Stands v. Hard Rock Cafe Intern.,* 951 F.2d 684, 697 (5th Cir.1992)("A jury finding of willfulness does not bind the trial court in determining whether this case is 'exceptional'; it may, however, serve as a guide." The Court states that bad faith or fraud could provide the high degree of culpability necessary to a showing of exceptional. *Id.)*

 Moreover, in cases in which there is no showing that the infringement was intentional at the time the defendant adopted the registrant's mark, or when such intent is unclear from the record, "[u]nreasonable post-adoption conduct rising to the level of bad faith could be evidence of the exceptional nature of a case, but the reasonable continuation of litigation should not automatically be such." *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 492 (5th Cir.1992). A party should not be penalized for defending or prosecuting a lawsuit when the party has a good faith belief in its position. *CJC,* 979 F.2d at 65.

 Vanwyk contends attorneys' fees should be awarded because Zimmer's actions were deliberate and willful. The jury found that Zimmer in the one instance passed off its product as that of Vanwyk, in violation of the Lanham Act. The evidence provided a reasonable basis for concluding that, aware that "DCD" was associated with Vanwyk, Zimmer deliberately attempted to pass off its machine as a Vanwyk machine. Zimmer succeeded in making Springs believe it bought a Vanwyk machine, even after the equipment was installed, thus confusing the relevant public. Zimmer's representation to Vanwyk that Springs had decided to use its money for other purposes and had not placed an order is evidence that Zimmer acted in bad faith.

The evidence provides a reasonable basis for concluding that Zimmer knew it was doing wrong and acted in bad faith. This might qualify it as exceptional under the above standards if it were egregious. This case, and this one instance of passing off, does not qualify as egregious under the *Badger* standard, for at least three reasons. First, it does not rise to the level of wrongfulness of the cases *Badger* cites as egregious, e.g., trying to put a company out of business. Second, the evidence also pointed to elements of dissimilarity between the Vanwyk and Zimmer systems. Springs was informed that it was getting a dye-dispensing system built in Spartanburg, S.C., from United States components. The system drawings said "Zimmer Machinery Corp," the tape dispensing function stated "Zimmer Dispensing," and the machine had a Zimmer nameplate on it. Third, Zimmer's defense to the Lanham Act claim has been presented in good faith.

The undersigned concludes that this case is not exceptional as that term is properly construed for purposes of awarding attorneys' fees under the Lanham Act. Accordingly, Vanwyk's petition for attorneys' fees is denied.

## V. Compensatory damages

Zimmer contends that the entire award of compensatory damages should be limited to nominal damages because Vanwyk did not prove its lost net profits, not having deducted overhead and operating expenditures from gross proceeds.

In addition, as to Glenoit Mills, Zimmer argues (1) that Vanwyk did not establish causation; and (2) that Vanwyk's lost profit calculation, which the jury awarded, should

have taken the purchase price Glenoit Mills paid for the dye-dispensing system, without including what Glenoit Mills paid for the lint removal system (which Zimmer had a right to sell), and subtracted from this amount Vanwyk's cost to produce the dye-dispensing system, without including the cost to produce a lint removal system, for an award of $2,340, rather than $27,886.

### A. Vanwyk properly presented evidence sufficient for the jury to determine its net pecuniary gains from the various transactions at issue.

"The weight of authority holds that fixed overhead expenses need not be deducted from gross income to arrive at the net profit properly recoverable. Most cases that have considered the argument that fixed overhead must be allocated and deducted have rejected it." Robert L. Dunn, *Recovery of Damages for Lost Profits*, Vol. 2, § 6.5 (Lawpress 1992, 4th edition).[6] Dunn explains:

> The true rule seems to be that the prospective profit should be diminished by charges comprising an essential element in the cost to manufacture .... Essential elements in such costs do not include remote costs, overhead or otherwise, but are confined to expenditures that would necessarily have been made in the performance of the contract. The only matter of concern is the detriment suffered or benefit lost as a result of the breach. If the fixed expenses neither increase nor decrease as a consequence of the nonperformance of the contract, there would be no loss or benefit arising from that factor.

*Id.*, citing *Oakland California Towel Co. v. Sivils*, 52 Cal.App.2d 517, 126 P.2d 651 (1942); *see* 22 Am.Jur.2d Damages at § 645 ("Thus it has been held in numerous cases that overhead expenses should not be deducted from profits, because they are not affected by the performance or nonperformance of a

particular contract."). *Accord, Sure–Trip, Inc. v. Westinghouse Engineering*, 47 F.3d 526, 531 (2d Cir.1995)("Where plaintiff is seeking to recover lost profits, such damages are equal to the revenue that would have been derived, less additional costs that would have been incurred, in performing the contract.... Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits...." (citations omitted)); *Vitex Manufacturing Corporation v. Caribtex Corporation*, 377 F.2d 795, 798 (3d Cir.1967)("Although there is authority to the contrary, we feel that the better view is that normally, in a claim for lost profits, overhead should be treated as a part of gross profits and recoverable as damages, and should not be considered as part of the seller's costs.").

The holding in *Drews Company, Inc. v. Ledwith–Wolfe Associates, Inc.*, 296 S.C. 207, 371 S.E.2d 532 (1988),[7] is consistent with the majority rule that fixed overhead costs are not properly deducted in calculating lost profits. The issue in *Drews* was whether the "new business rule" operates to automatically preclude the recovery of lost profits by a new business or enterprise. *Id.* 371 S.E.2d at 533. In holding that it does not, so long as the amount of lost profits is fixed to a reasonable certainty, the South Carolina Supreme Court began by setting out general principles:

> The purpose of an award of damages for breach is to give compensation, that is, to put the plaintiff in as good a position as he would have been in had the contract been performed.... The proper measure of that compensation, then, is the loss actually suffered by the contractee as the result of the breach....
>
> "Profits" have been defined as the net pecuniary gain from a transaction, the

---

6. The U.C.C. seems to agree that overhead expenses need not be deducted to arrive at lost profits:
 § 2–708(2): If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full

performance by the buyer, together with any incidental damages provided in this Article [Section 2–710], due allowance for costs reasonably incurred and due credit for payment or proceeds of resale.

7. From which this jury instruction was taken, and as to the definition of profits, taken *verbatim*.

gross pecuniary gains diminished by the cost of obtaining them....

*Id.* at 534 (citations and internal quotation marks omitted). The Court cautioned that one method does not apply inflexibly to all new business lost profit determinations:

While the factual contexts in which new business/lost profits cases will arise will undoubtedly vary, these methods of proof and the "reasonable certainty" requirement bear an inherent flexibility facilitating the just assessment of profits lost to a new business due to contractual breach.

*Id.* at 536.

The "just assessment of profits lost" required application of method to circumstance. Drews had contracted to renovate a building owned by Ledwith–Wolfe, which intended to convert the building into a restaurant. From the beginning, the project was plagued by construction delays, work change orders, and general disagreement over the quality of work performed. Drews eventually pulled its workers off the project and later filed, then sued to foreclose, a mechanic's lien for labor and materials used in renovating the building. Ledwith–Wolfe counterclaimed, alleging Drews breached the contract and forced Ledwith–Wolfe to rework part of the job. Ledwith–Wolfe also claimed that Drews' delays in performance caused Ledwith–Wolfe to lose profits from the restaurant. The jury returned $14,000 in lost profits caused by Drews' delays.

The South Carolina Supreme Court determined that the trial judge erred in failing to rule that, as a matter of law, Ledwith–Wolfe's proof was insufficient to merit submission to the jury. The $14,000 award of lost profits was reversed. The Court reached this conclusion by examining the evidence in light of the reasonable certainty standard:

Owner's projections of the profits lost by the restaurant because of the breach were based on nothing more than a sheet of paper reflecting the gross profits the restaurant made in the first 11 months of operation after construction was completed. These figures were not supplemented with corresponding figures for overhead or operating expenditures, but only with the

Owner's testimony that he "would expect at least a third of that [gross figure] to be" net profit. Owner's expectations, unsupported by any particular standard or fixed method for establishing net profits, were wholly insufficient to provide the jury with a basis for calculating profits lost with reasonable certainty.

*Id.* at 536.

Ledwith-Wolfe's proof provided no just basis for assessment of lost net profits, and so the award had to be overturned. The Court does not establish a hard and fast rule, contrary to the majority rule, that overhead/operating expenses must always be subtracted to determine net profit, but finds that subtracting such expenses could have been part of a "particular standard or fixed method" acceptable for this sort of new business, and in any event such a method was not established at trial. The Court here cites *South Carolina Finance Corporation of Anderson v. West Side Finance Company*, 236 S.C. 109, 113 S.E.2d 329 (1960), wherein the Court, drawing largely from Am.Jur. Damages, states:

The measure of damages for breach of contract is the loss actually suffered by the contractee as the result of the breach.... And profits that have been prevented or lost as the natural consequence of a breach of contract are recoverable as an item of damages in an action for such breach.... To warrant such recovery, loss of profit must be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative.... The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture, and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy.

*Id.* 113 S.E.2d at 335 (citations and internal quotation marks omitted).

▇ In arriving at a just assessment of the loss actually suffered by Vanwyk, an

established business with overcapacity in making an additional sale, overhead and operating expenditures, as *remote* costs, should not have been deducted from gross profits. Vanwyk would have incurred overhead whether or not the additional sale was made. This is in keeping with the majority rule. The proper measure was revenue that would have been derived less additional costs that would have been incurred in performing the contract.

By this standard, Vanwyk's evidence at trial was sufficient for the jury to determine net pecuniary gains from the various transactions. That is, the evidence was sufficient for the jury to determine gross pecuniary gains and the costs of obtaining them. Roberts, Vanwyk's president, testified that the damages Vanwyk asserted were its net pecuniary gain which it would have realized had it made the sales, i.e., the difference between the sales prices for the sales at Glenoit Mill, Twin Rivers, and Springs, less all costs that would have been incurred had Vanwyk made and sold the products, including selling expenses and all other associated costs.

### B. Vanwyk presented sufficient evidence as to why Vanwyk lost the sale at Glenoit Mills for the jury properly to have found that the lost sale was proximately caused by Zimmer's conduct.

Although issues of causation are to be decided by the jury, whether the evidence is sufficient to create a jury issue is solely a question of law to be determined by the court. *Miller v. Premier Corp.,* 608 F.2d 973, 981 n. 8 (4th Cir.1979).

Upon review of the evidence, the undersigned is persuaded that there was evidence on which the jury could properly base its verdict as to proximate cause of the loss of the sale to Glenoit Mills. Taken in a light most favorable to Vanwyk, giving Vanwyk the benefit of all reasonable inferences from the evidence, not weighing witness credibility, and not substituting the Court's judgment of the facts for that of the jury, the undersigned concludes that Vanwyk produced evidence demonstrating to a reasonable probability that Vanwyk would have been able to obtain the Glenoit Mills sale had Zimmer fully and faithfully represented Vanwyk. *Charleston Area Medical Center, Incorporated v. Blue Cross and Blue Shield Mutual of Ohio, Incorporated,* 6 F.3d 243, 247–48 (4th Cir.1993). Glenoit's Duncan testified that "if everything had been there, every—everything had been there that I wanted we could have put together on the price, yes, I probably would have bought the [Vanwyk] system." Duncan testified that the Vanwyk system quoted to Glenoit contained the components he was seeking ("This one—this one does include everything."). Vanwyk's was the lowest bid on Glenoit Mills.

### C. Under the standards of Rule 50, the compensatory damages verdict as to Glenoit Mills should not be disturbed.

Zimmer argues that the jury's award of compensatory damages as to the sale to Glenoit Mills is overstated because it includes the cost of a Kaelin lint removal system, which Zimmer continued to sell during the period of the Vanwyk–Zimmer relationship with Vanwyk's knowledge. Thus, according to Zimmer, Vanwyk's lost profit calculation (which the jury awarded) should have taken the purchase price Glenoit Mills paid for the dye-dispensing system, without including what Glenoit Mills paid for the lint removal system (which Zimmer had a right to sell), and subtracted from this amount Vanwyk's cost to produce the dye-dispensing system, without including the cost to produce a lint removal system, for an award of $2,340, rather than $27,886.

Rule 50 directs that the court may only grant judgment as a matter of law if, viewing the evidence in the light most favorable to the nonmovant and drawing every legitimate inference in the nonmovant's favor, the Court determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party. The jury heard from Roland Zimmer that Zimmer never gave up its right to sell Kaelin lint removal systems. The jury heard from Vanwyk President Roberts that, wherever else Zimmer might sell Kaelin, Zimmer's duty

was to promote Vanwyk lint removal systems when it was selling Vanwyk dispensing systems; and further, that Zimmer should have offered a Vanwyk lint removal system to Glenoit Mills, and had it done so, the profit would have been as the jury returned. The jury resolved the issue for Vanwyk. Drawing every legitimate inference in Vanwyk's favor, that resolution should stand.

## VI. Jury instructions

Zimmer argues that the Court instructed the jury improperly in four instances: (1) That a fiduciary duty could be found without the existence of an agency relationship, and that an agency relationship could exist without a showing of Defendants' power to bind Vanwyk to contracts; (2) That a Lanham Act violation could be found without any showing that the terms "DCD" or "Direct Compact Dispenser" are capable of protection as trademarks under the Lanham Act or have any form of secondary meaning; (3) As to a definition of "lost profits" that is contrary to South Carolina law; and (4) In instructing the jury as to equitable fraud (which does not support a legal remedy such as punitive damages) and that fraud could be based on a "concealment" without instructing as to a proper basis for a duty of disclosure because the only such basis was fiduciary duty and the Court failed to give proper instructions on that claim.

■ "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." *Rule 61, Fed.R.Civ.Pro.* "In ascertaining whether substantial rights have been affected [by errors in jury instructions], we look to the record as a whole, considering the allegations of the complaint, opening statements, the evidence, closing argument and the instructions." *Hallberg v. Brasher,* 679 F.2d 751, 757–58 (8th Cir.1982), *cited in Brewer v. Jeep Corp.,* 724 F.2d 653, 656 (8th Cir.1983). *See, Hardin v. Ski Venture, Inc.,* 50 F.3d 1291, 1294–96 (4th Cir.1995); *Well-*

*ington v. Daniels,* 717 F.2d 932, 938 (4th Cir.1983).

As to Zimmer's first assignment of error, the undersigned concludes, for reasons set out above, that the instruction accurately stated South Carolina law concerning the standard for the creation of a fiduciary relationship and the elements of an agency relationship. Even were the instruction in error, the error would be harmless, and certainly would not affect substantial justice, because the evidence was sufficient for the jury to conclude that Zimmer was Vanwyk's agent even under the narrow definition proposed by Zimmer.

As to Zimmer's second assignment of error, the undersigned concludes, for reasons discussed above, that the jury was accurately instructed, that Zimmer could be found liable for passing off under the Lanham Act even without proof of secondary meaning. Moreover, the evidence at trial established secondary meaning to the extent such was required.

As to Zimmer's third assignment of error, the undersigned concludes that the instruction was consistent with the definition of lost profits under South Carolina law, as discussed above. The instruction quoted *Drews Co., Inc. v. Ledwith–Wolfe, supra.*

As to Zimmer's fourth assignment of error, the undersigned concludes that the jury was accurately instructed, for reasons set out above. The instruction was drawn from *Ardis v. Cox, supra.* The instruction concerning fraud based on concealment was properly predicated on there being a fiduciary relationship or partial and incomplete representations. *See Ervin, South Carolina Request to Charge—Civil* § 21–13 (1994).

The undersigned having concluded that the instructions were accurate and not inconsistent with substantial justice, Zimmer's Rule 59 motion based on errors in jury instructions will be denied.

## VII. Remittitur

In the discussion of punitive damages, above, the undersigned set out the reasons that the Rule 50(b) and Rule 59 motions should be denied. For like reasons, remittitur will be denied. Vanwyk's evidence de-

picted a pattern of wrongful conduct which was adequately, and not excessively, reflected in the award of punitive damages.[8]

## VIII. Conclusion

For the reasons discussed above, Zimmer's Rule 50(b) and 59 motions [docs. 82–1, 82–2] are **denied** in their entirety. **It is so ordered.**

## ZIMMER'S MOTION FOR ATTORNEYS' FEES

Zimmer asks the Court to award it attorneys' fees regarding Vanwyk's claims for unfair trade practices under North Carolina law and misappropriation of trade secrets under South Carolina law. Zimmer asks for attorneys' fees on the grounds that the unfair trade practice claim, based on the Glenoit Mills transaction, was frivolous, and that the misappropriation of trade secrets claim was specious. For the following reasons, Zimmer's motion will be denied.

## I. Attorneys' fees under North Carolina Unfair Trade Practices claim

▮▮ Zimmer argues that the Court dismissed the claim on summary judgment, based on a finding that North Carolina law does not apply to it, making Zimmer the prevailing party. This conclusion was reached applying the teaching of *New England Leather Company v. Feuer Leather Corporation,* 942 F.2d 253 (4th Cir.1991), which decision predated Vanwyk's claim by several years. Vanwyk presented no cases to the contrary. Thus, the claim was frivolous, justifying attorneys' fees.

Under the North Carolina Unfair Trade Practices Act, a prevailing defendant must show that "the party instituting the action knew, or should have known, the action was frivolous and malicious." N.C.Gen.Stat. § 75–16.1(2). By this standard, attorneys' fees should not be awarded, inasmuch as the jury found that Zimmer committed both fraud and breach of fiduciary duty in the Glenoit Mills transaction.

## II. Attorneys' fees under South Carolina Trade Secrets Protection Act

▮▮ Zimmer contends that Vanwyk knew that Zimmer returned Vanwyk's documents. Further, Roberts testified that he had talked to no person or seen any document suggesting that Zimmer possessed any Vanwyk trade secret. Over seven months after filing the claim for misappropriation of trade secrets, Vanwyk stated in an interrogatory response that it did not know of facts supporting the claim ("Defendant's misappropriation of Vanwyk's trade secrets occurred secretly and the details of its wrongful conduct have not yet been made available to plaintiffs.") Throughout discovery, Zimmer maintains, Vanwyk did not produce evidence sufficient to establish the elements of a trade secret claim under S.C.Code § 39–8–1. At the close of all the evidence, Vanwyk did not oppose Zimmer's motion for judgment as a matter of law on the claim for misappropriation of trade secrets. Thus, Zimmer concludes, the claim was specious, and attorneys' fees should be awarded.

Under the South Carolina Trade Secrets Protection Act, a court may award reasonable attorneys' fees to a "prevailing party" if the claim is "made in bad faith." S.C.Code § 39–8–4. By this standard, Zimmer is not entitled to attorneys' fees. Vanwyk voluntarily abandoned its claim prior to trial and stated that it did so to streamline the case. Even if it is assumed that Zimmer "prevailed," Zimmer does not establish bad faith or that the claim was specious. The claim survived summary judgment.

## III. Conclusion

For these reasons, Zimmer's motion for attorneys' fees [doc. 85] is **denied.**

## VANWYK'S MOTION FOR ENTRY OF JUDGMENT ON CLAIMS OF UNJUST ENRICHMENT AND NORTH CAROLINA UNFAIR TRADE PRACTICES

Vanwyk contends, first, that Zimmer should be required to disgorge the profits

---

8. The *Gamble v. Stevenson* factors, set out and applied in the discussion of punitive damages, also support the conclusion that the exemplary award was not excessive to the miscarriage of justice.

which it gained as a result of its wrongful conduct, and second, that Vanwyk is entitled to judgment on its claim under the North Carolina Unfair Trade Practices statute, N.C.Gen.Stat. Ch. 75. For the following reasons, this motion will be denied in both respects.

## I. Disgorgement of Profits

 Vanwyk contends that Zimmer should be required to pay to Vanwyk its profits gained as a result of fraud and breach of fiduciary duty. According to Vanwyk, Zimmer should be required to disgorge $65,000 for Twin Rivers (a commission acknowledged by Zimmer in connection with the sale to Twin Rivers), $18,730 for Springs (undisputed gain received by Zimmer from the sale, calculated by taking Zimmer's claimed net loss of $5,650 and adding back the $24,380 of overhead which represents an allocation of costs that would have been incurred even if the equipment had not been sold, i.e., income less expenses), and $34,816 for Glenoit Mills (acknowledged profit of $1,892 plus $5,000 in warranty reserves that were never paid plus $27,924 in overhead "expenses" that would have been incurred in any event), to prevent Zimmer from receiving a windfall of double commissions at Twin Rivers and unjustly enriching itself at Vanwyk's expense. Vanwyk does not seek recovery under a theory of quantum meruit or quasi-contract.

In *Ellis v. Smith Grading and Paving, Inc.*, 294 S.C. 470, 366 S.E.2d 12 (App.1988), the Court defined unjust enrichment as follows:

Unjust enrichment is an equitable doctrine, akin to restitution, which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff. . . .

The terms 'restitution' and 'unjust enrichment' are modern designations for the older doctrine of quasi-contracts. . . .

The essential elements of a quasi-contract are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by defendant of the benefit under conditions that make it inequitable for

him to retain it without paying its value. . . .

*Id.* 366 S.E.2d at 14–15 (citations omitted).

Applying these principles, the Court concluded:

[I]n order for Ellis to recover, she must show she has conferred a benefit on Smith. . . . It is not enough for her to show Smith benefited from the breach of a duty to pay the IRS. . . .

Having found Ellis has neither alleged nor proven breach by Smith of a duty giving rise to a quasi-contractual right to restitution, the trial court should have granted Smith's motion to dismiss the complaint.

*Id.* (citations omitted).

The undersigned concludes that the principles set out in *Ellis* apply here and defeat Vanwyk's unjust enrichment claim. Vanwyk does not seek to recover what Vanwyk conferred upon Zimmer and Zimmer inequitably retained. Nor does Vanwyk seek recovery under a theory of quasi-contract. The basis of recovery under unjust enrichment is, therefore, not established. Moreover, the existence of a contract is generally held to preclude recovery in quasi-contract. *See, e.g.,* 22A N.Y. Jur.2d Contracts § 512 (1996) ("However, where a valid and enforceable contract exists governing a particular subject matter, it precludes recovery in quasi-contract for events arising out of the same subject matter."); *State Farm Mut. Auto Ins. Co. v. Atlantic Indem. Co.,* 122 N.C.App. 67, 468 S.E.2d 570, 574 (1996), *citing Booe v. Shadrick,* 322 N.C. 567, 369 S.E.2d 554, 556 (N.C.1988).

## II. North Carolina Unfair Trade Practices Act claim

 Vanwyk contends that since Zimmer changed its position as to the applicability of North Carolina law to the Glenoit Mills transaction, at trial arguing that North Carolina law applies, and since the jury found that Zimmer committed fraud and breach of fiduciary duty in that transaction, the Court should reinstate the § 75–1.1 claim and award Vanwyk judgment as a matter of law on it, entitling Vanwyk to recover, as a mat-

ter of law, $27,866, trebled, plus reasonable attorneys' fees.

■ The undersigned concludes that Vanwyk's North Carolina unfair trade practices claim should not be "reinstated" for the following reasons. Vanwyk supplies no case authority either for the appropriateness of asking the Court under Rule 50 to reverse its summary judgment ruling dismissing a claim, or for the legal substance of Vanwyk's position. Zimmer's change of position, if such it be, does not render inaccurate the summary judgment determination, derived from Fourth Circuit case law, that South Carolina law applies. A later change of position by a party does not require, or necessarily commend, a court's reversal of its earlier decision which was in agreement with that party's earlier position.

■ Vanwyk argues that applying N.C. Gen.Stat. § 75–4, a statute of frauds rendering unwritten non-compete agreements in North Carolina unenforceable, requires allowing the application of N.C. Gen.Stat. § 75–1.1, prohibiting unfair and deceptive acts and practices, to Zimmer's conduct. To the contrary, the applicability of each section is governed by choice of law rules grounded in public policies, and it seems contrary to principle and to reason to adhere to an *a priori* rule that applying one section requires allowing the application of other sections.

### III. Conclusion

For these reasons, Vanwyk's Motion for Judgment on Claims of Unjust Enrichment and North Carolina Unfair Trade Practices [doc. 93] will be **denied.**

### INTEREST

### I. Postjudgment

■ "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The federal interest rate, rather than the state interest rate, applies to an award of postjudgment interest in federal diversity actions. *Forest Sales Corp. v. Bedingfield,* 881 F.2d 111 (4th Cir.1989). Thus, the interest rate under 28 U.S.C. § 1961 applies to each

party's judgment. The applicable rate is the rate on 52–week Treasury bills at the last auction of those bills before judgment is entered. As of October 9, 1997, which is the latest date available from the Clerk's office, the rate was 5.49%.

### II. Prejudgment

#### A. Standard

■ State law applies to questions involving prejudgment interest in diversity cases. *United States v. Dollar Rent A Car Systems, Inc.,* 712 F.2d 938, 940 (4th Cir. 1983). Federal law applies to questions involving prejudgment interest in federal causes of action, and the Court has discretion whether to award prejudgment interest and at what rate. *Id.* at 941; *Coliseum Cartage Co. v. Rubbermaid Statesville,* 975 F.2d 1022, 1026 (4th Cir.1992) ("Ordinarily, when a [federal] statute is silent, the issue of prejudgment interest is committed to the sound discretion of the trial court.")

In *Babb v. Rothrock,* 310 S.C. 350, 426 S.E.2d 789 (1993), the Supreme Court of South Carolina discussed the standards for assignment of prejudgment interest:

> The law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum is certain or capable of being reduced to certainty.... The fact that the sum due is disputed does not render the claim unliquidated for the purposes of an award of prejudgment interest.... The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose.

*Id.* 426 S.E.2d at 791 (citations omitted). *Accord, APAC Carolina, Inc. v. Town of Allendale, South Carolina,* 41 F.3d 157, 165–66 (4th Cir.1994) (quoting *Babb* as above).

In *Republic Textile Equipment Company of South Carolina, Inc. v. Aetna Insurance Company,* 293 S.C. 381, 360 S.E.2d 540 (App. 1987), the South Carolina Court of Appeals determined that in the absence of an agree-

ment or statute, interest on an unliquidated tort claim is not recoverable.

■ The right of a party to prejudgment interest is not affected by rights of discount or setoff claimed by the opposing party. *Southern Welding Works, Inc. v. K & S Const. Co.,* 286 S.C. 158, 332 S.E.2d 102, 106 (App.1985).

■ Prejudgment interest may not be awarded on punitive damages. *See, U.S. v. Reul,* 959 F.2d 1572, 1578 (Fed.Cir.1992).

> In the absence of an agreement or statute, interest is not recoverable on an unliquidated claim.... In this case, the judgment was not on a policy of insurance, but lay in negligence for failure to procure insurance. The plaintiff's claim included lost profits and reduction of net worth as well as the value of its uninsured property. In an action for negligence, claims for lost profits or similar consequential loss are generally regarded as unliquidated damages for which prejudgment interest will not be awarded.... Moreover, although the amount that would have been due on the policy had the desired coverage been provided is an element of Republic's damages, we have found no authority for the proposition that such an amount, when recovered under a negligence cause of action, becomes due by operation of law before the total damages are reduced to judgment. In our view, that element of Republic's damages is similar to medical expenses in a personal injury action, which, though frequently ascertainable, do not normally entitle a plaintiff to prejudgment interest.

*Id.* 360 S.E.2d at 545–46 (citations omitted).

### B. Vanwyk's state law claims

■ As to Springs, Glenoit Mills and Twin Rivers, the undersigned concludes that revenues and costs were fixed and certain as of the date Zimmer made the sales at Springs (June 20, 1995), Glenoit Mills (September 19, 1995) and Twin Rivers (November 27, 1995). The amount of lost profits was calculated by examining conditions extant at the time of these sales (equipment sales

prices less expenses which would have been incurred had Vanwyk manufactured the product at that time). Roberts testified that historical cost factors were used to calculate lost profits.

Accordingly, Vanwyk is entitled to prejudgment interest at the rate provided by S.C.Code § 34–31–20 (8.75%) from the date of the sales.

### C. Vanwyk's Lanham Act claim

■ Awarding prejudgment interest, and at what rate, on the Lanham Act claim is within the sound discretion of the trial court, the statute being silent on prejudgment interest. *See, Quesinberry v. Life Insurance Co. of North America,* 987 F.2d 1017 (4th Cir.1993).

With respect to Lanham Act claims, the Second Circuit has held that "such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases." *American Honda Motor Co. v. Two Wheel Corp.,* 918 F.2d 1060, 1064 (2d Cir.1990) (affirming refusal to award prejudgment interest in Lanham Act case). The Seventh Circuit's announced rule is more liberal:

> [P]rejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay.
>
> The award of prejudgment interest is particularly appropriate in a case such as this where the violation was intentional, and indeed outrageous.

*Gorenstein Enterprises v. Quality Care–USA,* 874 F.2d 431, 436 (7th Cir.1989). The undersigned is unable to locate a Fourth Circuit reconciliation of these positions.

■ The Circuits agree that prejudgment interest should be awarded in "exceptional" cases. This is not an "exceptional" case.[9] Under the circumstances of this case, where the evidence showed intent, and taking into account the policies Congress sought to advance under the Lanham Act and § 1961, the undersigned concludes that the most faithful application of the law would be to award

---

9. *See* discussion under Lanham Act, above.

prejudgment interest for the Lanham Act violation, beginning with the date of sale to Springs. Further, the prejudgment interest rate should be that provided by the South Carolina Code § 34–31–20 (8.75%) and applicable to the other substantive claims in this case.[10]

### D. Zimmer's Commissions Arising From the Sales at West Point Stevens and Cherokee

The parties agree that Zimmer is entitled to prejudgment interest on the West Point Stevens claim.

The parties disagree over whether Zimmer is entitled to prejudgment interest on the Cherokee sale. At issue is when the payment was "demandable." Vanwyk's Roberts testified that commissions were not due and payable until the purchaser had paid in full. Zimmer offered no testimony in contradiction of this point. Under cross-examination by Mr. McKeithen, referring to Defendants' Exhibit 5, Roberts stated that, as to the Cherokee sale, $260,000 had been collected by March 1, 1995. According to Roberts, this was a downpayment which entitled Zimmer to no commission, because the arrangement was that the commission was payable once final payment had been made. Immediately thereafter, in reference to Defendant's Exhibit 32, Roberts testified that ten percent was to be paid as soon as Vanwyk was paid by the customer. Later, Roberts testified that as of June, 1995, no commission had been paid by Vanwyk to Zimmer on the Cherokee sale.

Defendant's Exhibit 32 reads, in relevant part:

3. Ten per cent commission will be paid to ZMA–SPA on every order as soon as it is paid by the customer.

*Id.*

Roberts' interpretation of this sentence to refer to payment in full was not contradicted by Zimmer. Accordingly, the undersigned concludes that the commission was not due, and prejudgment interest should not be awarded as to Cherokee.

10. Vanwyk cannot recover interest twice on the

### ORDER

For the reasons given above, **it is ordered** that Zimmer's motion for entry of judgment as a matter of law and, alternatively, for a new trial [docs. 82–1, 82–2], is **denied. It is further ordered** that Zimmer's request for remittitur is **denied. It is further ordered** that Zimmer's motion for attorneys' fees [doc. 85] is **denied. It is further ordered** that Vanwyk's motion for entry of judgment on claims of unjust enrichment and North Carolina Unfair Trade Practices Act [doc. 93] is denied. It is further ordered that Vanwyk's damages under the Lanham Act will not be trebled nor attorneys' fees awarded.

### *JUDGMENT*

**THIS MATTER** having come before the undersigned magistrate judge and a jury for trial on June 9, 1997, the jury having answered the following issues as indicated:

1. Did a contract exist between Vanwyk Textile Systems, B.V. and Defendants?
 **ANSWER:** __X__ [YES] ____ [NO]

2. Did Defendants breach any contract with Vanwyk Textile Systems, B.V.?
 **ANSWER:** __X__ [YES] ____ [NO]

3. If Defendants breached their contract with Vanwyk Textile Systems, B.V., what amount of damages has Vanwyk suffered as a result of that breach with respect to:

 Glenoit Mills Amount: $27,866.00

 Twin Rivers Textiles Amount: $1.00

 Springs Industries Amount: $29,887.00

4. Did a fiduciary duty exist between Vanwyk Textile Systems, B.V., and Defendants?
 **ANSWER:** __X__ [YES] ____ [NO]

5. Did Defendants breach any fiduciary duty owed to Vanwyk Textile Systems, B.V.?
 **ANSWER:** __X__ [YES] ____ [NO]

Springs claim.

6. If Defendants breached any fiduciary duty to Vanwyk Textile Systems, B.V., what amount of damages has Vanwyk suffered as a result of that breach with respect to:

Glenoit Mills Amount: $27,866.00

Twin Rivers Textiles Amount: $83,071.00

Springs Industries Amount: $29,887.00

7. Has Plaintiff established by clear, cogent and convincing evidence that Defendants committed fraud on Vanwyk Textile Systems, B.V.?
ANSWER: _X_ [YES] ___ [NO]

8. If Defendants committed fraud against Vanwyk Textile Systems, B.V., what amount of damages has Vanwyk suffered as a result of that fraud with respect to:

Glenoit Mills Amount: $27,866.00

Twin Rivers Textiles Amount: $1.00

Springs Industries Amount: $29,887.00

9. Did Defendants pass off their own product as that of Vanwyk Textile Systems, B.V., in violation of the Lanham Act?
ANSWER: _X_ [YES] ___ [NO]

10. If Defendants passed off their own product as Vanwyk Textile Systems, B.V.'s in violation of the Lanham Act, what amount of damages has Vanwyk suffered as a result of that violation with respect to:

Springs Industries Amount: $29,887.00

11. If you answered "YES" to either the issue of breach of fiduciary duty or the issue of fraud, then do you find that the Defendants are liable for punitive damages, and if so, in what amount?
ANSWER: _X_ [YES] ___ [NO]
Amount: $200,000.00

With respect to Zimmer's claims against Vanwyk:

1. Is Zimmer Machinery America entitled to recover a commission from Vanwyk on the sale of a dye-dispensing system by Vanwyk to Cherokee?
ANSWER: _X_ [YES] ___ [NO]

2. If yes, what amount of commission is Zimmer Machinery America entitled to recover from Vanwyk on the Cherokee sale?
Amount: $49,200.00

3. Is Zimmer Machinery America entitled to recover a commission from Vanwyk on the sale of a duplo rotary screen washer to West Point Stevens, Inc.?
ANSWER: _X_ [YES] ___ [NO]

4. If yes, what amount of commission is Zimmer Machinery America entitled to recover from Vanwyk on the West Point Stevens sale?
Amount: $1,685.00

5. Was Zimmer Machinery America the procuring cause during its relationship with Vanwyk of Vanwyk's sale of equipment to PMD Germany?
ANSWER: ___ [YES] _X_ [NO]

6. If yes, what amount of commission is Zimmer Machinery America owed on the sale?
Amount: _____

The jury having determined that Vanwyk have and recover of Zimmer damages in the amount of $140,824.00, and punitive damages in the amount of $200,000.00, and that Zimmer have and recover of Vanwyk commissions in the amount of $50,885.00, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Vanwyk have and recover from Zimmer $89,939.00 for actual damages and $200,000.00 for punitive damages. Vanwyk is entitled to prejudgment interest on its state law claims and its Lanham Act claim at the rate of 8.75% from date of sale. Vanwyk is not entitled to double recovery of prejudgment interest as to the Springs transaction. Zimmer is entitled to prejudgment interest on its West Point Stevens commission. Vanwyk is entitled to postjudgment interest on $89,939.00, at the rate of 5.49%.